RUSSELL D. THORNOCK AND CATHY A. THORNOCK, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 29123-86.          Filed March 19, 1990.

*Stephen E. Silver, Brad S. Ostroff,* and *Stephen D. Gardner,* for the petitioners.

*Theodore J. Kletnick* and *Sandy E. Freund,* for the respondent.

OPINION

SWIFT, *Judge*: This matter is before the Court on the parties' cross-motions for partial summary judgment. Rule

121(b). The motions raise essentially legal issues or issues of ultimate fact that the parties ask us to resolve, in the context of these motions, solely on the basis of the relevant undisputed stipulated facts, documents, and applicable law. This is a test case that will affect the outcome of other cases filed by investors in this and other transactions. The parties suggest that the resolution of the issues by summary judgment will significantly reduce and may eliminate entirely the need for what otherwise would be a lengthy trial in this case. We commend the parties for utilizing this procedure, and we appreciate the thorough manner by which their respective arguments have been made.

The issue presented by these motions is whether petitioner Russell D. Thornock (petitioner) was at risk within the meaning of section 465 with respect to partnership debt obligations associated with a computer equipment leasing transaction.

STIPULATED FACTS

### Original Purchase Transaction and End-User Lease

On May 7, 1979, Alanthus Corp. (Alanthus), an equipment leasing corporation, purchased certain computer equipment from International Business Machines Corp. (IBM) for $3,535,000. Simultaneously, Alanthus sold the computer equipment to Alanthus Computer Corp. (Alanthus Computer), one of its wholly owned subsidiary corporations, for the same amount.

In connection with its purchase of the computer equipment, Alanthus Computer borrowed $3,248,151 on a nonrecourse basis from Citicorp Industrial Credit, Inc. (Citicorp Credit), a lending subsidiary of Citicorp Bank unrelated to Alanthus and Alanthus Computer. The loan proceeds were used by Alanthus Computer, with additional cash of $286,849, to pay Alanthus the full purchase price of the computer equipment. Alanthus apparently used the proceeds received from Alanthus Computer to pay IBM the full purchase price due on its purchase of the computer equipment.

Under Alanthus Computer's 7-year promissory note to Citicorp Credit, monthly payments of principal and interest

at 11.5 percent per annum were due as follows: From June 1, 1979, through April 1, 1983,—$72,000; from May 1, 1983, through April 30, 1986,—$25,000.

As indicated, Citicorp Credit's $3,248,151 loan to Alanthus Computer was made on a nonrecourse basis. As collateral for the loan, Citicorp Credit received a security interest in the computer equipment and in the lease payments due under all end-user leases of the computer equipment until the full amount of the loan was paid off.

On March 27, 1979, in anticipation of its acquisition of the above computer equipment, Alanthus Computer entered into an end-user lease agreement with J.P. Stevens & Co., Inc. (J.P. Stevens), a company unrelated to Alanthus or Alanthus Computer, with respect to the computer equipment. The initial term of the lease was for 7 years, from May 1, 1979, through April 30, 1986. Thereafter, the lease could be renewed for successive 3-month terms until terminated by either party. Monthly lease payments were due, effectively matching the payments due on the promissory note to Citicorp Credit, in the following amounts: From June 1, 1979, through April 1, 1983,—$72,500; from May 1, 1983, through April 30, 1986,—$25,000.

Alanthus Computer and J.P. Stevens entered into a remarketing agreement under which Alanthus Computer was to be the exclusive agent to assist J.P. Stevens to remarket or sublease the equipment if J.P. Stevens chose to sublease the equipment. Under the remarketing agreement, Alanthus Computer agreed to reimburse J.P. Stevens for losses arising from the discontinuance of use or from a sublease of the equipment during the 5th through the 7th years of the original end-user lease, less Alanthus Computer's reasonable costs relating to its remarketing efforts. Also, during the 5th through 7th years of the initial lease, J.P. Stevens was to pay Alanthus Computer all amounts received under any sublease to the extent the monthly income received exceeded $25,000, the monthly amount due Alanthus Computer on the primary lease.

*Purchase By Partnership and Related Transactions*

On May 31, 1979, three additional and essentially simultaneous transactions occurred involving the computer equip-

ment with the apparent ultimate objective, among other things, of transferring ownership[2] of the computer equipment and assignment of the end-user lease (subject to the secured interest therein of Citicorp Credit) to Tiger Lily Leasing Associates (Tiger Lily), the equipment leasing partnership in which petitioners invested and through which petitioners now claim the losses and expenses at issue in this case.

The first transaction was a sale of the computer equipment and assignment of the end-user lease by Alanthus Computer to A-F Associates. That transaction was followed by the immediate resale of the computer equipment and reassignment of the end-user lease by A-F Associates to Alafund Associates. Both transactions, of course, were subject to the prior security interest of Citicorp Credit in the equipment and end-user lease payments due.

The stated purchase price for the purchase of the computer equipment by A-F Associates from Alanthus Computer was $3,777,297—$529,145 in cash and the assumption by A-F Associates of the $3,248,151 nonrecourse debt obligation of Alanthus Computer to Citicorp Credit. The stated purchase price for the purchase by Alafund Associates of the computer equipment from A-F Associates is not disclosed in the record, but Alafund Associates executed a $3,005,854 promissory note in favor of A-F Associates with respect to its purchase of the computer equipment. Although not completely clear, it appears that this $3,005,854 promissory note purports to be a recourse promissory note.

A-F Associates and Alafund Associates are two equipment leasing limited partnerships that, through subsidiary corporations, were owned and controlled by the same two corporate leasing companies. The general partner and 1-percent owner of A-F Associates was Alanthus. The sole limited partner and 99-percent owner of A-F Associates was Funding Systems Leasing Corp. (Funding Systems).

---

[2] Use in this opinion of "ownership," "purchase," "sale," and other words that normally suggest economic and legal ownership of property, or the transfer of same, is for convenience only and does not constitute any finding or conclusion as to which entity should be regarded as the owner, for tax purposes, of the computer equipment, an issue the parties have reserved for trial.

The general partner and 1-percent owner of Alafund Associates was Alanthus Venture Corp. (Alanthus Venture), a wholly owned subsidiary of Alanthus Computer, which as previously stated was a wholly owned subsidiary of Alanthus. The sole limited partner and 99-percent owner of Alafund Associates was F.S. Venture Corp., a wholly owned subsidiary of Funding Systems.

The ownership of Funding Systems and of F.S. Venture, the sole limited partners of A-F Associates and of Alafund Associates, apparently was unrelated to Alanthus.

Under the respective limited partnership agreements of A-F Associates and Alafund Associates, Funding Systems and F.S. Venture had no personal liability or responsibility for any liability of the partnerships except for their obligations to make their required capital contributions. Accordingly, in the event A-F Associates and Alafund Associates were unable to meet their respective debt obligations, only Alanthus and Alanthus Venture, the wholly owned second-tier subsidiary of Alanthus, would be liable for all such obligations as general partners of the partnerships.

Simultaneously with the above transactions between Alanthus, Alanthus Computer, A-F Associates, and Alafund Associates, Alafund Associates sold the computer equipment to the Tiger Lily partnership for a stated purchase price of $3,888,500, represented by a cash downpayment of $64,808 and a promissory note of $3,823,691. Interest was to accrue on the promissory note at 12 percent per annum, and payments designated as prepaid interest were to be made as follows: $356,445 on May 31, 1979, $39,511 on June 1, 1979, $18,794 monthly from July 1, 1979 through December 1, 1981, and $241,005 on February 15, 1980. Monthly payments of principal and interest in the amount of $66,495 were to be made from January 1, 1982, through February 1, 1989.

Tiger Lily's $3,823,691 debt obligation to Alafund Associates is referred to generally in the promissory note as a nonrecourse obligation of Tiger Lily. As such, the note could not be enforced against Tiger Lily or any of the assets of Tiger Lily other than the stated collateral. However, under the terms of the note and the Tiger Lily

partnership agreement, each limited partner is stated to be personally and on a recourse basis liable on the Tiger Lily promissory note to Alafund Associates to the extent of 436.600 percent of the partner's total capital contribution to the partnership. Under this provision, a limited partner of Tiger Lily (such as petitioner Russell D. Thornock) who subscribed to a $10,000 interest in Tiger Lily would be subject to a potential liability of $43,669.90 with respect to Tiger Lily's promissory note to Alafund Associates.

The extent of the personal liability of the limited partners on the Tiger Lily promissory note to Alafund Associates was limited by what is referred to in the documents as the "user rent achievement date." After such date, the stated recourse liability of the Tiger Lily limited partners on Tiger Lily's promissory note would be extinguished. The user rent achievement date is described as either the date by which the total net end-user lease rental payments received by the partnership from leasing the computer equipment equals $4,257,500 or February 28, 1986, whichever occurs first.

Tiger Lily immediately leased the computer equipment back to A-F Associates under a 10-year lease under which the lease payments due (with the exception of two payments of prepaid interest in the amounts of $356,445 and $241,005) matched Tiger Lily's payment obligations on its promissory note to Alafund Associates. The terms of Tiger Lily's lease to A-F Associates extended to February 28, 1989, 32 months beyond the expiration of the initial term of the end-user lease with J.P. Stevens.

Under the lease agreement with A-F Associates, Tiger Lily also was entitled to receive from A-F Associates, in addition to the lease payments mentioned above, 40 percent of all net rental income, if any, received by A-F Associates with respect to the end-user lease after the end-user lease payments had been applied to the note payments due Citicorp Credit.

In order to induce Tiger Lily to enter into the purchase and lease transactions with Alafund and A-F Associates, Alanthus unconditionally and on a full-recourse basis guaranteed Tiger Lily and its limited partners the full performance of all obligations of A-F Associates under its lease of the computer equipment from Tiger Lily. The Tiger Lily

investment memorandum expressly referred to this guaranty as follows, "Alanthus will guaranty [sic] all of the Lessee's obligations to [Tiger Lily]." The written guaranty agreement provided as follows:

* * * ALANTHUS CORPORATION (the "Guarantor") * * * does hereby unconditionally guarantee to [Tiger Lily] * * * the prompt and full performance and observance of all of the covenants, conditions and agreements of [A-F Associates] * * * including, without limitation, the full and prompt payment when due, whether by acceleration or otherwise, in accordance with the terms of the Lease, of rent and all other sums payable by [A-F Associates] to [Tiger Lily], whether absolute or contingent, secured or unsecured, matured or unmatured, and without regard to any grace periods provided for in the Lease, including, without limitation, payment of any stipulated loss value, deficiency payments, and all other sums due upon an Event of Default by [A-F Associates] * * * .

In addition to Alanthus' guarantee, Alafund Associates provided to Tiger Lily and its limited partners essentially the same unconditional guarantee with respect to the obligations of A-F Associates under the lease of the computer equipment from Tiger Lily except that Alafund Associates' obligations under its guarantee did not come into effect until after the user rent achievement date.

A chart depicting the general organization and structure of the above transactions has been stipulated by the parties and appears *infra* p. 446.

Under a remarketing agreement of May 31, 1979, Alanthus was appointed exclusive remarketing agent for Tiger Lily for 7 years after the termination of the lease with A-F Associates. For its remarketing efforts, Alanthus was to be paid fees typical for such services.

*Investments in Tiger Lily and Losses Claimed*

On May 31, 1979, petitioner executed a subscription agreement pursuant to which he became obligated to contribute $10,000 to the capital of Tiger Lily in exchange for a limited partnership interest in Tiger Lily. Petitioner contributed $6,500 to Tiger Lily upon execution of the subscription agreement, and he executed a promissory note in favor of Tiger Lily in the amount of $3,500, payable on February 15, 1980.

Other investors executed subscription agreements obligating them to contribute a total of $638,083 to the capital of Tiger Lily. Tiger Lily received $638,083 in capital contributions, $421,289 of which was contributed in cash and the remainder of which was represented by promissory notes.

On its Federal partnership information tax returns (Forms 1065) for 1979 through 1982, Tiger Lily reported losses of $1,014,273, $576,155, $346,927, and $266,573, respectively, and investment interest expense of $268,933, $474,550, $458,807, and $151,241, respectively. Petitioners claimed the following amounts as petitioner's allocable share of Tiger Lily's losses and deductions: 1979—$17,785; 1980—$18,157; 1981—$5,342; and 1982—$4,105. On audit, respondent disallowed all losses and expenses claimed relating to petitioner's investment in Tiger Lily.

## Legal Analysis

In *Levy v. Commissioner*, 91 T.C. 838, 862-865 (1988), we explained generally the legal principles applicable to the at-risk issue as follows. Under section 465, where individual investors or closely held corporations engage in the leasing of depreciable property, any loss with respect to the leasing activity is allowed only to the extent the investors are financially at risk with respect to the obligations of the leasing activity at the close of the taxable year. Sec. 465(a)(1) and 465(c)(1)(C).[3]

Investors generally are considered to be financially at risk with respect to investments in leasing activities to the extent they contribute money to the activities. Sec. 465(b)(1)(A). Investors also are considered to be financially at risk with respect to debt obligations of leasing activities to the extent they are personally liable for repayment of the debt obligations or to the extent they have pledged property, other than the property used in the activities, as security for the borrowed amounts. Sec. 465(b)(2).[4]

---

[3]Sec. 465 was added to the Internal Revenue Code by the Tax Reform Act of 1976, Pub. L. 94-455, 90 Stat. 1520, and applies to tax years beginning after Dec. 31, 1975.

[4]Sec. 465(b)(2) provides as follows:

(2) BORROWED AMOUNTS.—For purposes of this section, a taxpayer shall be considered at risk with respect to amounts borrowed for use in an activity to the extent that he—

(A) is personally liable for the repayment of such amounts, or

With respect to particular debt obligations, investors will be regarded as personally liable for such obligations within the meaning of section 465(b)(2)(A) if they are ultimately economically liable to repay the obligations in the event funds from the investment activities are not available to repay the obligations. The critical inquiry is who is the obligor of last resort, and the scenario that controls is the worst case scenario, not the best case. The fact that other investors or participants remain in the "chain of liability" does not detract from the at-risk amount of investors who have the ultimate liability. In determining which investors or participants in a transaction are ultimately financially responsible for the debt obligations, the substance of the transaction controls. *Melvin v. Commissioner*, 88 T.C. 63, 75 (1987), affd. per curiam 894 F.2d 1072 (9th Cir. 1990); *Pritchett v. Commissioner*, 827 F.2d 644, 647 (9th Cir. 1987), revg. and remanding 85 T.C. 580 (1985); *Follender v. Commissioner*, 89 T.C. 943, 949-950 (1987). See also *Raphan v. United States*, 759 F.2d 879, 885 (Fed. Cir. 1985), cert. denied 474 U.S. 843 (1985).

The above limitation on debt obligations with respect to which investors will be considered at risk is expressly reflected in the statutory scheme. Section 465(b)(4)[5] provides that even though investors nominally may be personally liable with respect to debt obligations, for tax purposes they will not be considered at risk for the debt obligations if their ultimate liability with respect to the debt obligations is protected against loss through "nonrecourse financing, guarantees, stop loss agreements, or other similar arrangements." The language "other similar arrangements" is not specifically defined in the Code or in the legislative history, but the legislative history evidences concern with situations in which investors are effectively immunized from any realistic possibility of suffering an economic loss even

(B) has pledged property, other than property used in such activity, as security for such borrowed amount (to the extent of the net fair market value of the taxpayer's interest in such property).

No property shall be taken into account as security if such property is directly or indirectly financed by indebtedness which is secured by property described in paragraph (1).

[5]Sec. 465(b)(4) provides as follows:

(4) EXCEPTION.—Notwithstanding any other provision of this section, a taxpayer shall not be considered at risk with respect to amounts protected against loss through nonrecourse financing, guarantees, stop loss agreements, or other similar arrangements.

though the underlying transaction is not profitable. *Larsen v. Commissioner,* 89 T.C. 1229, 1272-1273 (1987), on appeal (9th Cir., Dec. 12, 1988); *Melvin v. Commissioner, supra* at 70-71; *Bennion v. Commissioner,* 88 T.C. 684, 692 (1987); *Porreca v. Commissioner,* 86 T.C. 821, 838 (1985); S. Rept. 94-938 (1976), 1976-3 C.B. (Vol. 3) 49, 87.

As we have previously stated (see *Melvin v. Commissioner,* 88 T.C. at 75-76), particularly relevant to our analysis of this issue is the direction given to the Treasury by Congress in the Deficit Reduction Act of 1984, in response to the decision of the Claims Court in *Raphan v. United States,* 3 Cl. Ct. 457 (1983). In that case, the Claims Court made a determination of liability, or lack of liability, based primarily on the form of the transaction and on certain labels used by the parties to the transaction.[6] In response to the Claims Court decision in *Raphan,* Congress specifically directed the Treasury to promulgate regulations under section 752 to consider the substance and not merely the form of the financing, and particularly to consider current commercial lending practices with respect to guarantees, assumptions, and indemnities. Sec. 79, Deficit Reduction Act of 1984, Pub. L. 98-369, 98 Stat. 494, 597; H. Rept. 98-861 (Conf.), at 869 (1984), 1984-3 C.B. (Vol. 2) 123. We also believe it appropriate and incumbent on us to take into account under section 465(b)(4), the substance and the commercial realities of the financing arrangements presented to us by each transaction.

As applied particularly to a highly leveraged, tax-oriented, equipment leasing transaction (and depending on the issues raised), the above principles require us to analyze the substance and the commercial realities of all material aspects of the transaction. Neither the form chosen, the labels used, nor a single feature of the transaction generally will control.

---

[6]In *Raphan v. United States,* 3 Cl. Ct. 457 (1983), the Claims Court held that because none of the partners were personally liable on a partnership debt obligation, each limited partner was allowed to increase his basis in his investment in the partnership by his pro rata share of the partnership debt. The Claims Court treated the liability of the general partner under his "guarantee" of the partnership debt as a secondary liability since the word "guarantee" generally connotes a secondary liability vis-à-vis the primary obligor. *Raphan v. United States, supra* at 465-466. The Court of Appeals for the Federal Circuit reversed the Claims Court and held that in spite of the use by the parties of the term "guarantor," the general partner was personally liable for the partnership debt because he ultimately was liable therefor. *Raphan v. United States,* 759 F.2d 879, 886 (Fed. Cir. 1985), cert. denied 474 U.S. 843 (1985).

Also, although equipment leasing transactions (that are economically sound and that are not sham transactions) appear to be a type of tax-oriented transaction that Congress intended to encourage,[7] the significant tax-oriented aspects of such transactions require that the availability of the tax benefits be determined by the true underlying economic substance of the transactions and not by features of the transactions that are mere window dressing and that serve no economic purpose.

When the substance of the financial structure presented to us by the instant transaction is analyzed, it must be concluded that the limited partners of Tiger Lily were not at risk under section 465 with respect to the debt obligations of Tiger Lily. The ultimate and only independent creditor with respect to the purchase of the computer equipment was Citicorp Credit. Alanthus, and the various entities related to and controlled by Alanthus, as well as Tiger Lily and the limited partners of Tiger Lily, were removed from any realistic liability on the underlying, ultimate credit associated with this transaction and Tiger Lily and its limited partners were protected against any economic loss with respect thereto.

Citicorp Credit provided funds on a nonrecourse basis and looked only to the computer equipment as collateral. Neither Alanthus, Alanthus Computer, nor any of the related entities, nor Tiger Lily or its partners, had any liability or legal responsibility to see that Citicorp Credit was repaid on the loan, except the responsibility to act in good faith with regard to other aspects of the transaction. Other than its rights with regard to the end-user lease payments and the collateral, Citicorp Credit had no expectation or legal right to require any participant in the transaction to provide funds to pay off its nonrecourse loan. Thus, Citicorp Credit had no right to require Alanthus Computer, A-F Associates, Alafund Associates, Tiger Lily, or the limited partners of Tiger Lily to repay the loan; nor did Citicorp Credit have any right to require Alanthus Computer or any of the other entities involved in this transaction to enforce the guarantees of the Tiger Lily limited partners.

---

[7]See *Levy v. Commissioner,* 91 T.C. 838, 871-872 (1988); *Fox v. Commissioner,* 80 T.C. 972 (1983), affd. without published opinion 742 F.2d 1441 (2d Cir. 1984).

Due primarily to the guarantees of Alanthus and Alafund Associates with regard to A-F Associates' debt obligations to Tiger Lily, the extinguishment of the investors' purported personal liability on the partnership debt obligations upon the earlier of achievement of the user rent achievement date or February 28, 1986 (prior to which the limited partners were already realistically protected against any economic loss through the guarantees of Alanthus and Alafund Associates), the essentially offsetting nature of the various lease and note payments, combined with the nonrecourse nature of the underlying loan from Citicorp Credit, it is concluded that no realistic possibility existed that the Tiger Lily limited partners would be ultimately liable to make any payments on Tiger Lily's debt obligations to Alafund Associates. If A-F Associates defaulted on its lease payments to Tiger Lily, jeopardizing Tiger Lily's ability to make the payments due on its debt obligations to Alafund Associates, before any liability of the limited partners would be triggered, Alanthus and/or Alafund Associates would be required to honor their obligations under their guarantee agreements with Tiger Lily regarding A-F Associates' obligations, thereby providing the funds needed by Tiger Lily to pay Alafund Associates. That is the way the transaction was supposed to work if the value of the equipment declined and the end-user lease went bad. Under that scenario, Alanthus and Alafund Associates, through their guarantees—not the limited partners of Tiger Lily—would be responsible to provide the funds (or accounting entries) that would be necessary to keep the payments current on the debt obligations of Tiger Lily.

If A-F Associates defaulted on its lease obligations, and if Alanthus and/or Alafund Associates defaulted on their guarantees, it is obvious that Tiger Lily and its limited partners would be able to avoid any liability on Tiger Lily's debt obligations to Alafund Associates because, as a defense thereto, they would point to the failure of Alanthus and/or Alafund Associates to honor their guarantees not to allow A-F Associates to go into default on the lease payments. Because of the relationship between A-F Associates, Alanthus, and Alafund Associates, the defense of

Tiger Lily's limited partners to any liability would be effective.

For the reasons stated, the limited partners of Tiger Lily must be regarded as not at risk under section 465(b)(2) and as protected from loss under section 465(b)(4) with regard to Tiger Lily's debt obligations.

Our conclusion in this case is supported by a number of additional cases holding that the nominal or purportedly recourse liability of investors on partnership debt will not be regarded as satisfying the at-risk requirements of section 465(b) where the liability is completely diluted and protected by guarantees, by nonrecourse underlying third-party debt, and by conversion features of the purportedly recourse partnership debt that are tied to the referred-to guarantees. See also *Larsen v. Commissioner*, 89 T.C. 1229, 1270-1275 (1987), on appeal (9th Cir., Dec. 12, 1988); *Peters v. Commissioner*, 89 T.C. 423, 441-443 (1987).[8] Petitioners rely on a number of cases that have held that guarantees of debt by individual taxpayers may support at-risk amounts under section 465 in spite of the otherwise nonrecourse nature of the debt. These cases, however, involve certain material distinguishing facts. In both *Raphan v. Commissioner*, 759 F.2d 879, 885 (Fed. Cir. 1988), cert. denied 474 U.S. 843 (1985), involving the calculation of partners' basis under section 752, and in *Abramson v. Commissioner*, 86 T.C. 360, 366-367, 375-376 (1986) (Court reviewed), it was clear that the ultimate independent creditors in the transactions had agreed to make the nominally nonrecourse loans only in reliance on the enforceability of the investor guarantees. The guarantees ran to the creditors. The guarantees vested in the creditors the right to collect the loans from the guarantors, and they qualified the otherwise nonrecourse nature of the loans. The guarantees, in substance, effectively converted loans that were labeled "nonrecourse" and that otherwise would have been treated as nonrecourse into recourse loans enforceable against the guarantors. Further, it was clear that the investor-guarantors were the ultimate obligors on the loans and had no rights of subrogation or reimbursement against other parties. This latter fact distinguishes the guarantees in-

---

[8]See also *Moser v. Commissioner*, T.C. Memo. 1989-142.

volved in the referred-to cases from traditional guaranty situations under which the guarantors are only secondarily liable and under which the guarantors have rights of subrogation or reimbursement from other participants in the transactions. See, e.g., *Brand v. Commissioner*, 81 T.C. 821 (1983).

Petitioners also rely on a number of cases that have held that offsetting note and lease payments or the presence of related parties in a transaction do not necessarily result in a finding that investors were not at risk under section 465. Independently and absent the other factors present in this transaction, we might agree with petitioners on that point. See, e.g., *Gefen v. Commissioner*, 87 T.C. 1471, 1492-1493 (1986). Where, however, the underlying debt associated with a transaction is nonrecourse and where guarantees such as those involved in this case are made to the investors by the related parties which make it clear that no realistic, ultimate liability of the investors is intended, the offsetting payments and the relationships between the parties also are relevant factors in rejecting the alleged at-risk amounts.

Both parties make reference to a substantial body of general New York commercial law regarding the effect of the guarantees on the obligations of Tiger Lily's limited partners. Certainly, State law is relevant, and we have considered those authorities. No New York case cited to us, however, is precisely on point, and we do not believe it necessary, on the facts of this case, to elaborate on those authorities. Suffice it to say that we believe the New York courts would regard the substance of the relevant features of this transaction as we do (namely, as protecting the limited partners such as petitioner herein from any realistic possibility of realizing an economic loss with regard to Tiger Lily's debt obligations).

Lastly, petitioners argue that the potential bankruptcy of Alanthus and Alafund Associates could have put Alanthus and Alafund Associates in a position unable to honor their guarantees of the lease obligations of A-F Associates. Petitioners hypothesize that under that situation the limited partners of Tiger Lily would be ultimately liable on the partnership debt obligations to Alafund Associates. As

stated, however, any bankruptcy of Alanthus or Alafund Associates under which those entities would be relieved of their guarantee obligations likely would result in a release of Tiger Lily and its limited partners from their debt obligations to Alafund Associates. Also, the potential bankruptcy of entities providing guarantees or loss protection to investors is not a consideration in determining the application of section 465(b)(4) unless and until the bankruptcy actually occurs. *Capek v. Commissioner,* 86 T.C. 14, 52 (1986). In this regard, the report of the Senate Finance Committee with respect to section 465 states as follows:

> For purposes of this rule [i.e., section 465(b)(4)], it will be assumed that a loss-protection guarantee, repurchase agreement or insurance policy will be fully honored and that the amounts due thereunder will be fully paid to the taxpayer. The possibility that the party making the guarantee to the taxpayer, or that a partnership which agrees to repurchase a partner's interest at an agreed price, will fail to carry out the agreement (because of factors such as insolvency or other financial difficulty) is not to be material unless and until the time when the taxpayer becomes unconditionally entitled to payment and, at that time, demonstrates that he cannot recover under the agreement. [S. Rept. 94-938 at 50 n. 6 (1976), 1976-3 C.B. (Vol. 3) 49, 88.] [9]

For the reasons stated, the limited partners of Tiger Lily, including petitioner herein, are to be regarded as not at risk under section 465(b)(2) and as protected against loss under section 465(b)(4) with regard to Tiger Lily's debt obligations to Alafund Associates.

In light of our conclusions as set forth above, it is not necessary to address respondent's alternative argument that the creditors associated with Tiger Lily's debt obligations had continuing interests in the transaction other than as creditors, in violation of section 465(b)(3).

*An appropriate order will be issued.*

---

[9]See also *Klagsburn v. Commissioner,* T.C. Memo. 1988-364.