36 F.3d 1098
 74 A.F.T.R.2d 94-6555
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Defendant-Appellee,
v.
Bobby A. LEACH, Plaintiff-Appellant.
 No. 93-5295.
 United States Court of Appeals, Sixth Circuit.
 Sept. 22, 1994.
 
 Before: NELSON and SILER, Circuit Judges, and HACKETT, District Judge.*
 PER CURIAM.
 
 
 1
 This is a federal income tax case in which we must decide whether a taxpayer who had invested in a limited partnership tax shelter was "at risk" of personal liability within the meaning of Sec. 465 of the Internal Revenue Code, 26 U.S.C. Sec. 465. Having determined that the taxpayer did not face any real risk of personal exposure to the claims of creditors, the Internal Revenue Service disallowed the larger part of the deduction claimed by the taxpayer as his share of the partnership's losses. The taxpayer paid the taxes that the IRS said were due, and subsequently brought a refund suit in district court pursuant to 28 U.S.C. Sec. 1346(a)(1).
 
 
 2
 The taxpayer argued that he was "at risk" because he could be called upon to contribute additional capital to the partnership for repayment of a partial-recourse promissory note the partnership had issued. The district court (Jarvis, J.) disagreed, finding that the partnership's business deal was structured in such a way that there was "no realistic possibility" that Mr. Leach would ever have to come up with any additional capital. We agree, and we shall affirm the court's judgment.
 
 I.
 
 3
 We begin with a description of the entities involved with the partnership[1] and the roles that they played.
 
 
 4
 OPM Leasing Services, Inc. (an acronym for "Other People's Money," according to the government) is a New York corporation engaged in the business of equipment leasing. OPM has two subsidiaries relevant to this dispute, OPM Leasing Services, Inc./Picwun and OPM Leasing Services/Pictoo.
 
 
 5
 In May of 1976 OPM acquired an IBM 370/158 computer and auxiliary equipment for lease to Blue Cross Hospital Services, Inc., of Missouri. OPM paid for the property with the proceeds of a loan obtained from First Jersey National Bank. The bank took a note that was payable over seven years in monthly installments; these installments were approximately equal to the monthly lease payments OPM was to receive from Blue Cross.
 
 
 6
 In December of 1976 OPM obtained additional financing through National Bank of North America. OPM gave that bank a six-year promissory note and security interests in both the computer and the Blue Cross lease.
 
 
 7
 OPM then transferred its interests in the computer and lease to its Picwun subsidiary. Picwun agreed to assume OPM's obligation on the National Bank of North America note.
 
 
 8
 Picwun in turn sold the computer and assigned the lease to Pictoo, the other OPM subsidiary, at a price roughly equal to the purchase price of the computer. Picwun received a small cash payment from Pictoo, a non-recourse promissory note for the balance of the purchase price, and Pictoo's agreement to assume the obligation of the promissory note to National Bank of North America. Pictoo also gave Picwun a security interest in the equipment and lease.
 
 
 9
 Pictoo then sold the computer equipment and the Blue Cross lease to Picasso, a limited partnership organized under the laws of the District of Columbia. Picasso has two general partners and several limited partners; the taxpayer in this case, Bobby Leach, is one of the limited partners.
 
 
 10
 Like its predecessor in title, Picasso paid an amount approximately equal to the purchase price. Picasso's payment took the form of a small cash payment and a limited recourse promissory note naming Pictoo as the obligee. Picasso also agreed to assume Pictoo's obligations under the National Bank of North America secured note, and it gave Pictoo a security interest in the computer equipment and lease.
 
 
 11
 Before any of these transactions was consummated, the parties had arranged that Picasso would lease the equipment back to Picwun for a term of 10 years and one day. Picwun was to make monthly rental payments to Picasso in an amount equal to the promissory note payments Picasso was to make to Pictoo. Both OPM and Pictoo agreed, unconditionally and with full recourse, to guarantee all of Picwun's obligations under the Picwun-Picasso lease. This was to assure the Picasso partners that there would always be a source of funds in amounts equal to Picasso's monthly obligation to Pictoo.
 
 
 12
 Picasso was formed to carry out a single function: entering into the leaseback arrangement with Picwun and Pictoo. The financial responsibilities of the limited partners were carefully circumscribed. When he purchased his partnership interest, which he did on December 31, 1976, Mr. Leach was required to make a cash payment of $24,000 and to execute a promissory note to Picasso for the $36,000 balance of the investment, which totaled $60,000. The partnership agreement signed by Mr. Leach at this time provided that "no Limited Partner shall be responsible for the obligations of any other partner" and also stated that "[n]o Limited Partner shall have any personal liability or obligation for any liability or obligation of the Partnership otherwise than as set forth in Section 2.1 [of this agreement]."
 
 
 13
 Although the agreement provided that each limited partner could be called upon to make additional capital contributions, these additional contributions were capped at 267 percent of the partner's pro rata share of the partnership capital at the time he entered the partnership. Having made a capital contribution of $60,000 upon entry into the partnership, Mr. Leach's maximum capital contributions could be no more than $160,200. The agreement also placed a time limit on the limited partners' liability for additional capital contributions; any obligation to contribute additional capital would be extinguished on the "User Rent Achievement Date," as defined by the note Picasso issued to Pictoo. (The "User Rent Achievement Date" was the date on which the total payments by Blue Cross on the lease--now assigned to Picasso--exceeded $595,970.) After this date, which was February 28, 1978, the recourse liability of the limited partners was to be totally extinguished. Finally, the agreement provided that the partnership could demand additional partner contributions only for the purpose of meeting the monthly payment obligations to Pictoo, and only as they became due.
 
 
 14
 Although the note Picasso issued to Pictoo provided that Pictoo might seek payment from the partners of Picasso, Pictoo's ability to call for this payment was limited in several respects. First, after the "User Rent Achievement Date" described above, there could be no recourse to the individual partners. Second, the amount Pictoo could seek from each individual partner was limited to his or her pro rata share, in accord with the partnership agreement described above.
 
 
 15
 As anticipated, Picasso and Beta reported substantial losses (based upon depreciation and interest costs) in 1976 and 1977. In filing his income tax returns in those years, Mr. Leach reported his proportionate share of the partnership's losses.[2] After investigating the Picasso and Beta partnership returns, the Internal Revenue Service disallowed Mr. Leach's deductions. Mr. Leach paid the deficiencies and filed claims for refund. Mr. Leach brought the present suit against the United States in 1991, after the IRS had turned down the refund claims.
 
 
 16
 The parties stipulated the facts of the case and agreed that the only unresolved issue was whether the taxpayer was "at risk" within the meaning of Sec. 465 by virtue of his unmatured obligation to contribute additional capital to the partnership for payment of the partial-recourse note held by Pictoo. Since the only unresolved issue was a legal question, the parties also agreed that the case be decided on cross-motions for summary judgment. The district court granted the United States' motion and denied Mr. Leach's. Mr. Leach then filed a timely appeal.
 
 II.
 
 17
 A taxpayer involved in a transaction to which Sec. 465 applies may only deduct losses--in this case partnership losses--to the extent that he is "at risk" of real economic loss. Section 465(b)(2) provides that a taxpayer is "at risk" for borrowed amounts, but only to the extent that he is personally liable on the debt or has secured the debt with a pledge of property other than that used to finance the venture. 26 U.S.C. Sec. 465(b)(2). This section also provides that "[n]otwithstanding any other provision of this section, a taxpayer shall not be considered at risk with respect to amounts protected against loss through nonrecourse financing, guarantees, stop loss agreements, or other similar arrangements." 26 U.S.C. Sec. 465(b)(4).
 
 
 18
 The district court concluded that Mr. Leach faced no real risk of financial responsibility in the event of default by one of the other parties to the tax shelter because of the time limitations on the liability of the limited partners and because of the guaranty arrangement whereby Pictoo, the payee of Picasso's promissory note, had unconditionally guaranteed the source of the payments for this debt.
 
 
 19
 Mr. Leach contends that he is entitled to the full deduction for his share of the losses reflected on the partnership's financial statements because, in the event of a default by the lessee, he would be required to make capital contributions to satisfy the partnership's obligations under the partial-recourse promissory note issued to Pictoo. He relies on Emershaw v. Commissioner of Internal Revenue, 949 F.2d 841 (6th Cir.1991), to support the proposition that he should be viewed as the deep pocket of last resort in the event of default by any of the parties to the transaction.
 
 
 20
 The taxpayer in the Emershaw case was a limited partner whose personal exposure was subject to restrictions similar to those enjoyed here by Mr. Leach. In Emershaw an entity known as CIS Corporation had purchased computer equipment with funds borrowed from several lending institutions and had leased the equipment to end-users. CIS sold the equipment, subject to the end-user lease and the bank liens, to Program, a company set up to facilitate sale-leaseback transactions. The sale was financed by a full-recourse promissory note. Program sold the equipment, subject to the lease and liens, to LEA, a limited partnership in which Emershaw was an investor. LEA executed a partial-recourse promissory note in favor of Program (much like the one Picasso gave to Pictoo), payable in monthly installments. LEA then leased back the property to CIS for a monthly lease payment approximately equal to LEA's obligation to Program. LEA received a guaranty of CIS's rent obligation, but the guaranty ran from a third party, Continental (CIS's parent corporation).
 
 
 21
 The guaranty arrangements in the two cases are clearly distinguishable. LEA, the partnership in Emershaw, did not have an arrangement whereby Program, the payee of LEA's obligation, would guarantee funds for LEA's payments. In the case at bar, however, the only entity to which the partnership was obligated had insured that the source of funds to be used in repayment of that obligation would continue. This difference has obvious relevance to the question of whether Mr. Leach was "at risk" of having to pay the full amount of his agreed capital contribution.
 
 
 22
 Emershaw teaches that we must look to the "worst case scenario" to determine whether the taxpayer faced any real risk of liability for additional capital to cover the partnership's obligations. In the "worst case scenario" in Emershaw, namely a default by the end user accompanied by the insolvency of CIS and Program, the taxpayer might have been left holding the bag. Had its guarantor also become insolvent, the partners would have been personally liable to satisfy LEA's debt to Program.
 
 
 23
 When the arrangement between Picasso, Picwun, and Pictoo is dissected, however, it is apparent that even if there had been a default at every stage in the transaction, with every one of the parties proving to be insolvent, Mr. Leach would not have faced any actual risk of liability. Because the rent due on Picasso's lease to Picwun (which was guaranteed by Pictoo) was approximately equal to Picasso's loan repayment obligations to Pictoo, Pictoo and Picasso held approximately equal offsetting obligations to one another in the event of Picwun's default on the leaseback lease. Regardless of the economic condition of Pictoo at the point of default, the obligation under Pictoo's guaranty would inevitably cancel Picasso's debt under the promissory note.
 
 
 24
 Unlike the situation presented in the Emershaw case, where the guarantor was a third party not otherwise connected to the transaction, the guarantor in this case is also the payee of the Picasso note. The district court was correct, then, when it observed that if Picwun had gone bankrupt and thus could not make good on its lease obligations, Picasso would have an airtight defense, given Pictoo's guaranty of the lease, if Pictoo ever sued it for payment on the note. Even if OPM, Picwun, and Pictoo all went bankrupt, the guaranty would provide a setoff against Picasso's obligations to Pictoo under the note. Because the guarantor was also the obligee of the Picasso note, the insolvency of the guarantor would have resulted in no harm to the Picasso partnership.
 
 
 25
 Section 465 provides, as we have seen, that a taxpayer is not at risk with respect to "amounts protected against loss through nonrecourse financing, guarantees, stop loss agreements, or other similar arrangements." 26 U.S.C. Sec. 465(b)(4). Because Picasso's liability to Pictoo would, under the worst case scenario, be directly offset by Pictoo's liability to Picasso under the lease guaranty, the guaranty arrangement with OPM and Pictoo effectively insulated Picasso from responsibility for covering its obligations to Pictoo. Since the only purpose for which the partnership could call upon Mr. Leach would be for making payment on the Pictoo note, he was protected from loss by the guaranty arrangement and was not "at risk" according to Sec. 465(b)(4).[3] See Thornock v. Commissioner of Internal Revenue, 94 T.C. 439, 454 (1990), in which the Tax Court held, under circumstances involving a guaranty arrangement nearly identical to the one presented here, that the limited partner-taxpayer was not at risk of personal liability for the partial recourse obligations of the partnership.
 
 
 26
 Mr. Leach argues that when he joined the partnership he faced a possibility that a bankruptcy court would uphold Picasso's obligation to pay Pictoo under the promissory note, yet disregard (for some unidentified reason) Pictoo's reciprocal obligation to guarantee Picwun's lease obligations.[4] If this situation had materialized, he argues, the limited partners of Picasso might have ended up liable to Pictoo with no recourse to Pictoo for the source of those repayments.
 
 
 27
 Emershaw holds that the courts must look to the "worst case scenario," but the scenario must be a reasonably realistic one. A finding that Mr. Leach could have been held personally liable for Picasso's obligation could only rest on speculation that a court would disregard what appears to be a fully valid and unconditional guaranty. Nothing in Emershaw or in Martuccio v. Commissioner, --- F.3d ----, 1994 WL 389146 (6th Cir.1994), which follows Emershaw, requires us to indulge in this kind of speculation.
 
 
 28
 AFFIRMED.
 
 
 
 *
 The Honorable Barbara K. Hackett, United States District Judge for the Eastern District of Michigan, sitting by designation
 
 
 [1]
 The taxpayer was actually a limited partner in two partnerships relevant to this dispute, one named Beta and the other named Picasso. Beta and Picasso operated exactly the same way. The parties have agreed that there is no relevant distinction between them and have stipulated that any of this court's conclusions regarding Picasso apply with equal force to Beta. The parties have used Picasso as the model for the appeal, and we shall follow suit
 
 
 [2]
 In 1976, Mr. Leach claimed $66,706 in losses from the Picasso partnership and $44,471 in losses from Beta. In 1977, he claimed $60,688 in losses from Picasso and $40,459 from Beta
 
 
 [3]
 Mr. Leach's argument that he was "at risk" because he was liable to the partnership and not to Pictoo is not convincing, because Picasso's authority to demand capital contributions from the limited partners was restricted to the purpose of paying currently due note payments to Pictoo
 
 
 [4]
 The partnership investment memorandum contains a section describing what the organizers of the tax shelter anticipated in terms of the Sec. 465 "at risk" requirement:
 "It is not expected that investors will have to pay any portion of the sums due on the partnership's purchase notes.
 Th[e] period [of potential liability] will end ... 13 months after the Partnership's acquisition of the Equipment.... [I]t is unlikely that any default would occur in the next 13 months.... In any event, a default by the User ... would not by itself trigger a call....
 An investor's principal risk during the exposure period is that the Lessee [Picwun] might default on the Lease.... [W]hile the Seller [Pictoo] might sue to enforce payment of past due installments of the notes ... the Partnership would have offsetting counterclaims under the Seller's guaranty of the Lease for rents in arrears under the lease. The counterclaims at all times would exceed and should satisfy the sum of the past due note installments. In the event of a bankruptcy, the effect of the counterclaims would be less certain, though probably no different. Because of the extraordinary powers of the bankruptcy courts, however, it is not possible to say with absolute assurance that a court could not compel an investor to pay his share of the [obligation]." (Emphasis added.)