Wade L. MOSER and Lynn R. Moser; Gary A. Bahmiller and Cody K. Bahmiller; Berkley B. Strothman and Cathoryn Strothman, Appellants,

v.

COMMISSIONER OF INTERNAL REVENUE, Appellee.

No. 89–2560.

United States Court of Appeals, Eighth Circuit.

Submitted June 11, 1990.

Decided Sept. 13, 1990.

James L. Norris, Bismarck, N.D., for appellants.

David I. Pincus, Washington, D.C., for appellee.

Before MAGILL and BEAM, Circuit Judges, and LARSON,* Senior District Judge.

MAGILL, Circuit Judge.

Taxpayers, Berkley B. and Cathoryn Strothman, appeal the decision of the United States Tax Court[1] which found tax deficiencies in 1981 due to their receipt of an unreported $100,000 dividend. The Strothmans argue that the tax court clearly erred when it found that: (1) the October 30, 1981 general journal entry crediting their notes payable accounts by a total of $100,000 was not made in error; and (2) as a result of that entry, they constructively received a $100,000 fully taxable dividend. We find no error and affirm.

Taxpayers, Cathoryn and Berkley Strothman, Lynn R. and Wade L. Moser, and Cody K. and Gary A. Bahmiller, appeal the decision of the tax court which found tax deficiencies in connection with deductions they claimed stemming from the sale and leaseback of computer equipment.[2] The court found that the taxpayers were not at risk within the meaning of 26 U.S.C. § 465, because they were protected from any realistic possibility of economic loss. We affirm.

## I.

The tax court set out in great detail the facts at issue in this appeal. T.C. Memo 1989–142, 56 T.C.M. (CCH) 1604, 1604–06, 1613–14, 1617–23, 1632 (1989). We need not repeat them at great length. Instead, we summarize the facts pertinent to the resolution of the questions before us; namely, (1) whether the tax court's factual finding that the October 30, 1981 general journal entry was not made in error was clearly erroneous; and (2) whether the tax court erred in holding that the recourse portion of the limited recourse notes were not at risk within the meaning of § 465.

*$100,000 Dividend*

Inland Oil and Gas is a corporation with its principal place of business in Bismarck, North Dakota. Since its incorporation in 1967, Inland has used the cash basis method of accounting and has had a fiscal year ending August 31.

Berkley and Cathoryn Strothman are married with three daughters, two of whom are Cody Bahmiller and Lynn Moser.[3] Since Inland's incorporation, the Strothmans and their daughters have been its officers and directors. Mr. Strothman has also served as Inland's president. From November 14, 1977 through August 31, 1982, the Strothmans each owned 320 of Inland's 1,000 shares of outstanding common stock. Their three daughters each owned 120 shares.

For its fiscal year ending August 31, 1981, Inland had taxable income in the amount of $1,779,367. As a result of several dividend payments made to the taxpayers through the end of that fiscal year, Inland was left with $1,264,319 in undistributed taxable income (UTI). As of October 25, 1985, Inland's UTI was $1,185,949.24, reflecting distributions in the form of dividends made on September 25, 1981.

On October 26, 1981, before ascertaining the precise amount of UTI for the fiscal year ending on August 31, 1981, Inland's board of directors approved the distribution of $374,022.36 of UTI to each of the Strothmans and lesser amounts to each of their daughters. However, the distributions were not in proportion to their ownership interests in the company. The board of directors also instructed that the shareholders loan back to Inland the amounts distributed for a period of one year, without interest.

On the same day, Inland issued checks denominated "For Dividends" to each of the Strothmans in the amount of $324,022.36, and to their daughters in lesser

---

\* THE HONORABLE EARL R. LARSON, Senior United States District Judge for the District of Minnesota, sitting by designation.

1. The Honorable Thomas B. Wells, Judge, United States Tax Court.

2. North American Communications filed an amicus curiae brief in support of the taxpayers.

3. The Strothmans' third daughter is not a party to this appeal.

amounts. Such payments were proportional to their ownership interests in Inland. However, the checks actually issued to each of the Strothmans was for $50,000 less than the amount approved at the meeting.

Consistent with the board of directors' instructions, the Strothmans subsequently loaned back the amounts received to the company. Entries to reflect these loans were made in Inland's books of account under notes payable, on October 26, 1981 to Mr. Strothman, and on October 28, 1981 to Ms. Strothman. An adjusting entry dated October 30, 1981, in the amount of $100,000 ($50,000 for each of the Strothmans) was also made in Inland's general journal, debiting "Shareholder's Undistributed Taxable Income" and crediting "Notes Payable —Shareholder." Corresponding entries of $50,000 for each of the Strothmans were subsequently made in the notes payable subsidiary ledgers to reflect the October 30, 1981 general journal entry. However, it is not clear exactly when that particular entry was made, although the tax court found it was probably made in August of the following year.

On August 31, 1982, the end of the 1982 fiscal year, Inland issued a check payable to the Strothmans for $100,000. According to a notation in Inland's checkbook, the check's purpose was "[f]or Purchase of preferred stock[,] RePayment of Loan." The Strothmans immediately endorsed the check and Inland redeposited it into its bank account. Inland thereafter decreased each of the Strothmans' notes payable accounts and increased each of their preferred stock accounts by $50,000.

Ms. Leingang, Inland's bookkeeper since 1979, had no formal accounting education. She often had trouble distinguishing between the notes payable and UTI accounts and sometimes made errors in posting entries to these accounts. For example, errors were made on six occasions in September and October of 1981. Loyd E. Orser, a partner in an accounting firm, was Inland's and the Strothmans' accountant until 1982. It is at the feet of Orser and Leingang that the Strothmans lay the blame for the alleged $100,000 error.

The Commissioner of Internal Revenue issued a deficiency notice to the Strothmans, increasing their 1981 taxable income by $100,000, explaining that

> [t]he journal entry on the books of Inland Oil and Gas Corporation dated October 30, 1981, creating notes payable to you in the amount of $100,000.00 results in a distribution of property other than money in the tax year 1981. Such distribution is a taxable dividend under sections 301 and 316 of the Internal Revenue Code and is includible in your gross income under section 61 of the Code.

After a trial, the tax court agreed with the Commissioner and held that the Strothmans each received a fully taxable $50,000 dividend. The Strothmans subsequently filed this appeal.

### Computer Sale–Leaseback Arrangement

During the years at issue in this appeal, 1981–1983, Finalco, Incorporated, a closely-held corporation, was engaged in a number of leveraged computer leasing transactions whereby it negotiated and entered into leases with end-users, purchased the equipment, financed the purchase with a lending institution, and then resold the equipment in a sale and leaseback with third parties.[4] C.I.T. Corporation (CIT) operated as the lending institution. Pershing & Company, the end-user, is a division of a large investment management and brokerage company, which was under an agreement to lease the used computer equipment at issue in

---

4. Several other cases involving leveraged computer leasing transactions arranged by Finalco have recently reached the courts. *See, e.g., Larsen v. C.I.R.,* 909 F.2d 1360, 1370 (9th Cir.1990) (taxpayer not at risk because of plain language of purchase agreements and economic realities surrounding the transactions); *Baldwin v. United States,* 904 F.2d 477, 483 (9th Cir.1990) (taxpayer not at risk because of arrangement's circular nature and parties' lack of independent means to pay their obligations; no realistic possibility of economic loss); *Shriver v. C.I.R.,* 899 F.2d 724, 726 (8th Cir.1990) (sale and leaseback of computer equipment transaction was a sham to be disregarded for tax purposes because it had no non-tax purpose and was without potential for economic profit).

this appeal. Comdisco, Inc. is a corporation engaged in the purchase, sale and leasing of computer equipment. Comdisco sold the computer equipment to Blackwood Corporation, Finalco's sister corporation, who then assigned its interests in the equipment to Finalco. Finalco subsequently sold the equipment to Lease Pro, Inc., a company engaged in the purchase, sale, and leasing of computer equipment. The taxpayers then purchased the equipment from Lease Pro and leased it back to Finalco. A brief summary of the relevant details of this complicated transaction follows.

On September 30, 1981, Comdisco sold the computer equipment to Blackwood subject to existing liens and leases for $3,550,-000. Included in its purchase was computer equipment under lease to Pershing through August 31, 1984. Under the terms of the lease, Pershing was obligated to make thirty-six monthly rental payments to Comdisco, each in the amount of $27,385. This equipment was subject to a lien in that it was the sole collateral for a note owed by Comdisco to CIT in that CIT could only look to the proceeds from the equipment for repayment of the note. The repayment schedule of that note called for thirty-six monthly payments, each in the amount of $27,385.

On October 1, 1981, Blackwood assigned its interest in its agreement with Comdisco to Finalco which in turn agreed to assume all of Blackwood's liabilities under the agreement with Comdisco. As such, Finalco acquired the computer equipment subject to the Pershing lease and the CIT lien.

The circular transaction at issue in this appeal began with several agreements dated December 8, 1981.[5] On that date, Finalco sold the computer equipment to Lease Pro for a purchase price of $878,076. Like

Blackwood and Finalco before it, Lease Pro agreed that its computer purchase was subject to any prior liens, assignments or encumbrances, including the CIT note and the Pershing lease. Under the terms of the agreement, Lease Pro was to pay $20,260 as a down payment, and execute three promissory notes and security agreements in the aggregate amount of $121,260, and three full recourse installment promissory notes in the amount of $736,176.

Also on December 8, 1981, the Strothmans, Mosers and Bahmillers agreed to purchase the Pershing computer equipment from Lease Pro for $878,076, the same price Lease Pro paid Finalco. The form of consideration differed slightly, however. The terms of the Strothmans' agreement were $15,000 in cash, $86,000 in full recourse promissory notes and $510,934 in limited recourse notes. The limited recourse notes specified that the Strothmans were personally liable only up to $343,023.[6] The additional amounts were specified as nonrecourse. The terms of the Mosers' agreement were $2,800 in cash, $19,200 in full recourse promissory notes and $111,-338 in limited recourse notes. The limited recourse notes specified that the Mosers were personally liable only up to $75,964.[7] The additional amounts were specified as nonrecourse. Finally, the terms of the Bahmillers' agreement were $2,800 in cash, $19,200 in full recourse promissory notes and $110,804 in limited recourse notes. The limited recourse notes specified that the Bahmillers were personally liable only up to $75,631.[8] The additional amounts were specified as nonrecourse. Like the parties before them, the taxpayers' purchases were subject to the CIT lien and the Pershing lease.

---

**5.** While the agreements were dated December 8, 1981, there is no indication that they were actually finalized at that time. For convenience sake, however, we will assume that the date on the agreements corresponds with the date of the actual transactions.

**6.** The tax court held that the Strothmans were not at risk for this amount of their limited recourse notes. 56 T.C.M. at 1628; *see infra* at 1047–50.

**7.** The tax court held that the Mosers were not at risk for this amount of their limited recourse notes. 56 T.C.M. at 1628; *see infra* at 1047–50.

**8.** The tax court held that the Bahmillers were not at risk for this amount of their limited recourse notes. 56 T.C.M. at 1628; *see infra* at 1047–50.

Another of the December 8, 1981 agreements provided that the Strothmans, Mosers and Bahmillers would lease the computer equipment to Finalco and receive from Finalco ninety-six fixed monthly rental payments,[9] plus fifty percent of net rentals received by Finalco from the underlying Pershing lease after December 1987. By separate letter, dated December 8, 1981, Finalco consented to Lease Pro's transfer and assignment to the taxpayers of the rights and duties relating to the Pershing computer equipment. In other letters, also dated December 8, 1981, Finalco relieved Lease Pro of its obligation to deliver full recourse promissory notes for the equipment in exchange for the delivery to Finalco of the taxpayers' promissory notes.

Finally, on December 8, 1981, the taxpayers assigned to Lease Pro their rights under their lease agreement with Finalco to the fixed rental payments and instructed Finalco that those payments should be made directly to Lease Pro. In that way, Lease Pro could apply the rental payments against the taxpayers' limited recourse notes.

The arrangement between Finalco, Lease Pro and the taxpayers had come full circle. Under the arrangements described above, the ninety-six fixed monthly rental payments Finalco owed to the taxpayers were identical to the monthly installments the taxpayers owed Lease Pro on their limited recourse notes which, in turn, were identical to the monthly installments Lease Pro owed Finalco on the Finalco–Lease Pro notes. Therefore, in making the fixed rental payments, no cash was exchanged since the amount owed by each Finalco, Lease Pro and the taxpayers equaled the amount each was due. The tax court found no evidence that Finalco and Lease Pro even exchanged offsetting checks.[10]

From 1981 to 1983, the taxpayers reported net losses with respect to the computer leasing equipment in the following amounts: the Strothmans claimed a net loss in 1981 of $88,613, in 1982 of $106,800 and in 1983 of $50,571; the Mosers claimed a net loss in 1981 of $20,001 and in 1982 of $7,522; and the Bahmillers claimed a net loss in 1981 of $19,921 and in 1982 of $7,509. After auditing their returns, the Commissioner disallowed their claimed net losses from the equipment explaining, in part, that their investment in the computer purchase-lease back arrangement was not at risk. The tax court agreed with the Commissioner, in part, holding that the taxpayers were "not at risk for the Limited Recourse notes during the years in issue." 56 T.C.M. at 1628. The taxpayers appeal.

## II.

As a preliminary matter, we note that we review the tax court's findings of fact under the clearly erroneous standard and its conclusions of law de novo.[11] RTS Inv. Corp. v. C.I.R., 877 F.2d 647, 650 (8th Cir.1989) (per curiam); Estate of Palmer v. C.I.R., 839 F.2d 420, 423 (8th Cir.1988). We will not find clear error if the tax court's account is plausible in light of the record viewed in its entirety, even if we would have weighed the evidence differently. Anderson v. City of Bessemer City, 470 U.S. 564, 574, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985) ("[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous"); C.I.R. v. Transport Mfg. & Equip. Co., 478 F.2d 731, 734 (8th Cir.1973) ("[i]n reviewing Tax Court decisions, we apply the clearly erroneous standard. Findings supported by substantial evidence on the record as a whole which are not against the clear weight of evidence or induced by an erroneous view of

9. Under this plan, the monthly payment to the Strothmans would be $8,338.26, to the Mosers would be $1,817.69 and to the Bahmillers would be $1,809.01.

10. The tax court also found that the taxpayers were the ultimate debtors in this transaction,

while CIT was the ultimate creditor. 56 T.C.M. at 1627.

11. Our inquiry into whether the tax court erred in applying the at risk rules of § 465, infra at 1047–50, is a legal issue which we review de novo. Larsen v. C.I.R., 909 F.2d 1360, 1362 (9th Cir.1990).

the law will not be disturbed on appeal"). Therefore, we will reverse the tax court's findings of fact if, after reviewing all the evidence, we are left "with the definite and firm conviction that a mistake has been committed." *Anderson v. City of Bessemer City*, 470 U.S. at 573, 105 S.Ct. at 1511 (quoting *United States v. Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948)).

### A.

■ We confront two issues in our review of whether the tax court erred in holding that the Strothmans received $100,000 of unreported dividend income in 1981 as a result of the October 30, 1981 general journal accounting entries increasing the balances on their notes payable accounts. First, we must determine whether the tax court's factual finding that the general journal entries were not in error was clearly erroneous. Second, if that finding did not constitute clear error, we must decide whether the tax court erred in finding that the Strothmans constructively received a $100,000 dividend as a result of that general journal entry. After a thorough review both of the record and the Strothmans' attack on the tax court's factual findings, we find substantial evidence to support the tax court's finding that the general journal entries were not made in error. We cannot say that we are left with a definite and firm conviction that a mistake has been committed.[12]

The Strothmans attempt to attack the tax court's findings on several fronts. First, they argue that there was no evidence whatsoever to support the tax court's conclusion that Mr. Strothman had no knowledge of the journal entries. We disagree. The $374,022.36 approved for distribution to each of the Strothmans by the board of directors was exactly $50,000 in excess of the amount of the dividend check written to each of them on the same day. The tax court rejected Mr. Strothman's testimony as not credible to the extent he claimed that he had no knowledge of the journal entries. The court stated that "[t]he $50,000 difference between the amounts approved at the meeting and the amounts of the checks should have been noticeable to an experienced businessman like Mr. Strothman, especially considering that he and Mrs. Strothman received the checks so proximately to the time of the meeting."[13] 56 T.C.M. at 1617. We are extremely reluctant to reverse the tax court's factual findings to the extent they turn on the credibility of Mr. Strothman as a witness. *Anderson v. City of Bessemer City*, 470 U.S. at 575, 105 S.Ct. at 1512.

Second, the Strothmans argue that the tax court's reference to the entries in the subsidiary ledgers in August of 1982 was misplaced because those entries had no bearing on whether the October 30, 1981 general journal entry was made in error. We again disagree. It is reasonable to infer that the general journal entries dated October 31, 1981 were not made in error but were endorsed by the corporation from the subsequent entries in the subsidiary ledger increasing each of the Strothmans' notes payable accounts by $50,000, especially when the entries were backdated to October 31, 1981, the precise date of the general journal entry. We find no error with the tax court's reasoning when it stated that

> [t]he fact that entries were made to increase the balances in the notes payable subsidiary ledgers in August 1982 rather than to reverse the corresponding entry

12. We note that the tax court reviewed at length the testimony of the witnesses, noting evidence supporting both sides. 56 T.C.M. at 1613–14. It is clear that the tax court carefully considered the relevant evidence in issuing its findings. Therefore, we will not lightly disturb them.

Because of the tax court's lengthy and detailed recitation of the evidence supporting its findings, we will not reinvent the wheel by reciting all the evidence in the record supporting the tax court's decision. It is enough for us to say that after reviewing the entire record, we do not find any of the court's findings to be clear error.

13. The Strothmans argue that the tax court did not make a credibility finding. When read in the context of its opinion, it is clear the court found that given Mr. Strothman's experience and the timing of the events, he could not have been truthful when he testified that he had no knowledge of the journal entries.

previously made in the general journal, indicates to us that the $50,000 additions to notes payable in effect were endorsed by Inland. The balances in the Strothmans' notes payable accounts, without regard to the $50,000 entries in issue, were approximately $1,300 and $39,000 from May 1982 until November 1982. If Inland truly had not intended for the notes payable accounts to include the $50,000 additions, we think that the appropriate course of action should have been either (1) for the preferred stock to be issued for no more than $1,300—the lower of the Strothmans' two note balances at that time (without regard to the $50,000 in issue), or (2) if there were a reason for the preferred stock to be issued in the amount of $100,000, for the Strothmans to pay cash to Inland sufficient to make up the differences between the cost of the stock and the balances of each of their respective notes payable accounts. Neither course was followed, and such a failure could be interpreted as the corporation's endorsement of the accounting position reflected in its ledgers. 56 T.C.M. at 1616.[14]

Third, the Strothmans argue that CPA Orser, in a telephone call to their bookkeeper Sue Leingang, instructed her to make the general journal entry. The conclusion that the Strothmans draw from this is that Orser "did not want Mr. Strothman to learn of the errors he made and thus, he did not inform Mr. Strothman about his errors or about the existence of the general journal entry that he told Sue Leingang to make."[15] As we have already stated, *supra* at 1045, the tax court found that Mr. Strothman's denial of any knowledge of the entries was not credible. Merely because the Strothmans can draw different inferences from the evidence presented at trial

is not sufficient to constitute clear error.[16] We therefore conclude that the court's finding that the journal entries were not made in error was not clearly erroneous.

■ Therefore, we must determine whether the tax court erred in finding that the Strothmans constructively received a $100,000 dividend as a result of that general journal entry on October 31, 1981. The taxpayers' citations to *Sullivan v. United States*, 363 F.2d 724 (8th Cir.1966), *cert. denied*, 387 U.S. 905, 87 S.Ct. 1683, 18 L.Ed.2d 622 (1967), and *Sachs v. C.I.R.*, 277 F.2d 879 (8th Cir.), *cert. denied*, 364 U.S. 833, 81 S.Ct. 63, 5 L.Ed.2d 59 (1960), concern whether a particular payment constitutes a constructive dividend, not whether a dividend has been constructively received. The $50,000 dividends in question were *declared dividends*, authorized by the board of directors. *Clements v. C.I.R.*, 50 P–H Tax Ct. Mem. 2040, 2047 (1981) ("[i]t has long been settled that amounts declared a dividend are to be considered distributions"). The Strothmans do not challenge the tax court's conclusion that their receipt of the two $50,000 notes, as reflected in the general journal entries, did not constitute untaxable distributions of Inland's 1981 UTI. The court's conclusion was based upon its findings that Inland's subchapter S status terminated effective August 31, 1981 and the notes were not distributions of money which may relate back to the prior fiscal year under § 1375(f).

In ascertaining when the Strothmans constructively received the above-mentioned declared dividend, we ask whether the $100,000 was "unqualifiedly made subject to their demands" in October 1981 as a result of the journal entries. *See Patton v.*

---

14. The tax court's statements, we believe, effectively mute the substance of CPA Nitschke's testimony, which the Strothmans cite in their brief.

15. We note that in an affidavit, Orser stated that he had no recollection of talking to Sue Leingang regarding the events in question.

16. We have reviewed the remaining attacks on the tax court's factual findings and conclude the

Strothmans' arguments are without merit. Most of the remaining attacks involve a recitation of the testimony of a variety of witnesses which the Strothmans argue support their claim that they had no knowledge of the general journal entries. It is not appropriate for this court, sitting in review, to retry this case. It is enough that we find there is sufficient evidence in the record to support the tax court's finding that the general journal entry was not in error.

*United States*, 726 F.2d 1574, 1577 (Fed. Cir.1984); *Bush Bros. & Co. v. C.I.R.*, 73 T.C. 424, 438–39 (1979), *aff'd*, 668 F.2d 252 (6th Cir.1982). If so, then the Strothmans constructively received a dividend [17] on October 31, 1981.[18] In *Bush Bros.*, the tax court stated that

> [u]nder section 1.301–1(b), Income Tax Regs., a dividend "shall be included in the gross income of the distributees when the cash or other property is unqualifiedly made subject to their demands." This issue is factual. *Avery v. Commissioner*, 292 U.S. 210 [54 S.Ct. 674, 78 L.Ed. 1216] (1934). Its determination is based upon three tests: (1) shareholder's unrestricted, legal right to demand payment at any time, (2) no agreement involving shareholders to defer payment and, (3) the ability of the corporation to fulfill the dividend.

*Id.* at 438–39. We find the *Bush* court's three tests helpful in resolving whether a dividend is unqualifiedly made subject to a shareholder's demands and adopt them as our own.

The Strothmans concede that Inland had the ability to pay the dividend in the amount of $100,000 and that no agreement existed to defer any payments to them. They argue, however, that they did not have an unrestricted, legal right to demand payment at any time because they did not know about the notes payable entries. Our conclusion that the tax court's factual findings on that point are not clearly erroneous disposes of their argument and leads us to conclude that the tax court's factual finding that the Strothmans had an unrestricted, legal right to demand payment at any time was not clear error.

Therefore, we hold that the tax court's factual finding that the journal entry was not made in error is not clearly erroneous and that the Strothmans constructively received a fully taxable $100,000 dividend as a result of the general journal entry on October 31, 1981.

## B.

26 U.S.C. § 465(a)(1), (c)(1)(C) provides that a taxpayer may take a deduction from leasing depreciable property "only to the extent ... the taxpayer is at risk." Generally, a taxpayer is at risk for the amount of money and adjusted basis of other property contributed to an activity and for the amount he borrowed for use in the activity to the extent that he "is personally liable for the repayment of such amounts, or ... has pledged property, other than property used in such activity, as security for such borrowed amount." *Id.* § 465(b)(1), (2); *see* H.R.Rep. No. 1445, 95th Cong., 2d Sess. at 67 (1978), U.S.Code Cong. & Admin.News 1978, pp. 6761, 7103 (a taxpayer is at risk generally to the extent he "could actually lose from the activity"). The taxpayers are all purportedly personally liable on a portion of their limited recourse notes. The Strothmans are "personally liable" up to $343,023, the Mosers up to $75,964 and the Bahmillers up to $75,631. The tax court held that the taxpayers were not at risk with respect to these amounts, however, because the structuring of their notes as recourse obligations was mere "window dressing" used to enable taxpayers to circumvent the at risk rules and because they were effectively protected against economic loss in connection with those notes.

The Internal Revenue Code provides an exception to the general rule that a taxpayer is at risk for the amount of cash invested in the activity and for *the amounts borrowed for which there is personal liability.* "[A] taxpayer shall not be considered at risk with respect to amounts protected against loss through nonrecourse financing, guarantees, stop loss agreements, *or other similar arrangements.*"

---

**17.** The constructive receipt concept "is designed to prevent taxpayers who can control the timing of the receipt of income from shifting the year of receipt so as to avoid or reduce the tax to which they would normally be subject." *Patton,* 726 F.2d at 1577.

**18.** Treas.Reg. § 1.451–1(a) requires that income be included in the year in which it is "actually

§ 465(b)(4) [19] (emphasis added). Although the statute does not define the phrase "other similar arrangements," the legislative history sheds some light on it. The Senate Report states that a taxpayer's capital is not at risk "to the extent he is protected against economic loss on all or part of such capital by reason of an agreement or *arrangement* for compensation or reimbursement to him of any loss which he may suffer." S.Rep. No. 938, 94th Cong., 2d Sess. 49 (1976); *see also infra* at 1048.

In *Baldwin v. United States*, 904 F.2d 477 (9th Cir.1990),[20] the Ninth Circuit explained that the purpose of § 465(b)(4) is

> to suspend at risk treatment where a transaction is structured—by whatever method—to remove any realistic possibility that the taxpayer will suffer an economic loss if the transaction turns out to be unprofitable. A theoretical possibility that the taxpayer will suffer economic loss is insufficient to avoid the applicability of this subsection. We must be guided by economic reality.

*Id.* at 483; *see Larsen v. C.I.R.*, 909 F.2d 1360, 1369 (9th Cir.1990); *Krause v. C.I.R.*, 92 T.C. 1003, 1018 (1989); *Klagsbrun v. C.I.R.*, T.C. Memo. 1988–55, 55 T.C.M. 1519, 1521 (1988). The court explained that if the taxpayer ultimately suffers an unexpected loss, or "a realistic possibility develops that the taxpayer will suffer a loss," the taxpayer will be at risk at that time and be able to take the deductions that had previously been suspended for the prior years. *Baldwin*, 904 F.2d at 483; *see Larsen v. C.I.R.*, at 1368.

The Ninth Circuit's interpretation of § 465(b)(4) finds strong support in the legislative history. The Senate Report states that

> [f]or purposes of [§ 465(b)(4) ], it will be assumed that a loss-protection guarantee, repurchase agreement or insurance policy will be fully honored and that the amounts due thereunder will be fully paid to the taxpayer. The possibility that the party making the guarantee to the taxpayer, or that a partnership which agrees to repurchase a partner's interest at an agreed price, will fail to carry out the agreement (because of factors such as insolvency or other financial difficulty) is not to be material unless and until the time when the taxpayer becomes unconditionally entitled to payment and, at that time, demonstrates that he cannot recover under the agreement.

S.Rep. No. 938, 94th Cong., 2d Sess. 50 n. 6 (1976), U.S.Code Cong. & Admin.News 1976, pp. 2897, 3486. While it may be appropriate to examine the worst-case scenario in determining whether a taxpayer is personally liable for amounts that he has borrowed for use in an activity when applying § 465(b)(2), *see Krause*, 92 T.C. at 1017, such an analysis is not proper when determining whether the "taxpayer has engaged in a loss-limiting arrangement prohibited by subsection 465(b)(4)." *Baldwin*, 904 F.2d at 482.

▆ In sum, in deciding whether the Strothmans entered into a loss-limiting arrangement prohibited by § 465(b)(4) and were therefore not at risk on the portions of their limited recourse notes heretofore described, we inquire whether the arrangement, as structured, removed any realistic possibility that they would suffer an economic loss if the underlying transaction turned unprofitable. Economic reality is our guide.[21]

---

or constructively received" by the taxpayer.

**19.** This circuit has never had occasion to interpret § 465(b)(4).

**20.** The Strothmans cite the tax court opinion in *Baldwin v. United States*, 88–1 U.S.T.C. (CCH) 9151, p. 83, 167, 1987 WL 59586 (S.D.Cal.1987). This opinion was subsequently reversed by the Ninth Circuit. *See Baldwin*, 904 F.2d 477 (9th Cir.1990). We find the Ninth Circuit's interpretation of § 465(b)(4) to be more persuasive. It is consistent with the statute's legislative history.

**21.** The taxpayers argue that the tax court has confused the tax law concept of economic reality with state law. We disagree. The tax court merely examined the economic reality of the circular arrangement. The court noted that the taxpayers were "personally liable" for a portion of their limited recourse risk. Nevertheless, applying § 465(b)(4) and looking at whether there was a realistic possibility of economic loss, the tax court concluded that the taxpayers were not at risk because their investment was effectively immunized from loss by its very nature.

■ There was no realistic possibility that the Strothmans would suffer any economic loss if the underlying transaction became unprofitable. First, as the tax court concluded, the circular nature of the arrangement between the Strothmans, Lease Pro and Finalco effectively immunized the Strothmans from economic loss. The payments on their limited recourse notes to Lease Pro were identical to Lease Pro's payments on its notes to Finalco which in turn were identical to Finalco's lease payments to the taxpayers. Each party's obligation was satisfied by offsetting bookkeeping entries, without the exchange of cash. With the exception of one of the parties declaring bankruptcy or for some reason defaulting on their obligations, the taxpayers point to no circumstance under which one of the parties to this circular arrangement would break the chain of payments, or demand that the other parties satisfy their obligations in cash. As we stated, *supra* at 1048, economic reality is our guide. We agree with the tax court that neither Finalco nor Lease Pro would enforce any part of the limited recourse note against the taxpayer. First, the taxpayers would have an equal, offsetting claim to assert against Finalco. Second, it is unlikely Lease Pro could obtain enforcement of the notes without first having to pay Finalco. The possibility that one of the parties will at some future point become insolvent and/or bankrupt, or decide for whatever reason to suspend payments, is not material under § 465(b)(4) unless and until the time the event happens or a realistic possibility develops that it might. The taxpayers have not made such a showing.

Second, Finalco, Lease Pro and the Strothmans were all protected from any realistic possibility of economic loss in connection with any outstanding liability on the CIT note because CIT could only look to the proceeds from the sale or lease of the computer equipment for repayments on its note. Although the taxpayers are the ultimate debtors with respect to the loans financing the computer equipment, only CIT was ultimately at risk for purposes of § 465. We agree with the tax court that

neither Lease Pro nor Finalco would likely be able to collect from the taxpayers for any claims arising under the limited recourse or Finalco/Lease Pro notes unless they first demonstrated that they had been forced to pay on their obligations to some other party higher up in the chain of liability (i.e., Comdisco or CIT). *See Thornock v. C.I.R.*, 94 T.C. 439 (1990). Any other conclusion ignores economic reality. As the tax court correctly explained,

[t]here would be no economic justification for enforcement of [the taxpayers'] nominally [sic] recourse liabilities where the other entities in the chain of liability had no corresponding recourse liability. The resulting enrichment that Finalco would receive if such liability were enforced against [the taxpayers] thus would be without economic substance or reality. We believe the nominal structuring of [the taxpayers'] notes as recourse obligations in substance was only window dressing in an effort to avoid the provisions of section 465. If the limited recourse note had been structured as non-recourse obligations, the economics of the transaction would be no different.

56 T.C.M. at 1628. We agree with the tax court that the Strothmans were effectively immunized "from any realistic possibility of suffering an economic loss on the Limited Recourse notes, even if the underlying transactions were not profitable." *Id.*

The taxpayers attempt to distinguish the Ninth Circuit's decision in *Baldwin*. The facts in that case are nearly identical to the case at bar. The Baldwins were limited partners in June Partners, Ltd. Finalco purchased IBM computer equipment from Southwestern and leased it back for twenty-four months. Finalco borrowed money from a lender to finance its purchase. The lender took a security interest in the equipment and lease to Southwestern. Shortly thereafter, the circular arrangement at issue in *Baldwin* was created. Finalco sold the equipment, subject to the lease and security interest, to Softpro. Softpro sold the equipment, also subject to the lease and

security interest, to June Partners[22] who leased the equipment back to Finalco. Under this circular arrangement, the payments on June Partners' long-term note to Softpro was identical to the payments on Softpro's long-term note to Finalco, which in turn was identical to the minimum payments of Finalco's lease from June Partners. The parties satisfied the three equal obligations each month by offsetting bookkeeping entries and no cash exchanged hands. *Baldwin*, 904 F.2d at 479, 480. The tax court held that the Baldwins were not at risk for their assumption of personal liability because no realistic possibility existed that June Partners, and therefore the Baldwins, would suffer an economic loss if the transaction became unprofitable. *Id.*

The taxpayers attempt to distinguish this case by arguing that the parties in *Baldwin* all lacked the independent means to pay their debts. As applied to the Baldwins, the court's conclusion that the taxpayers faced no realistic possibility of economic loss was based not only on the fact that the parties to the transaction lacked the independent means to pay off their limited recourse notes, but on the fact that these particular parties were involved in the circular scheme. It was the combination of these factors which compelled the court's conclusion. *Id.* at 483. Similarly, the tax court's holding in the case at bar was based not only on the circular nature of the scheme but on its finding that neither Finalco nor Lease Pro could likely collect from the taxpayers for any claims arising out of the limited recourse and the Finalco-Lease Pro notes without first showing it had been forced to pay on its liability to Comdisco or CIT, which would be impossible since neither had recourse rights. It is the combination of these two factors which compelled the tax court's conclusion.

Furthermore, the taxpayers argue that Mr. Strothman, Ms. Moser and Ms. Bahmiler testified that they believed they were liable on portions of their limited recourse notes. While their perceptions are not irrelevant, the standard we must apply is economic reality. Even assuming they believed they were at risk, the nature of their arrangement effectively insulated them from economic loss.

Finally, we note that the taxpayers concede in their brief that the likelihood was slight they would end up with liability. This fact, they argue, merely represents their sound business judgment. As we have held, a theoretical possibility of loss, which is all the taxpayers have presented, is insufficient to avoid the applicability of § 465(b)(4). During the years in question, there just was no realistic possibility that they would suffer an economic loss if the transaction turned unprofitable.[23]

We conclude that the taxpayers were not at risk for the recourse portion of the limited recourse notes because of § 465(b)(4).

### III.

Finding no error, we affirm the judgment of the tax court.

---

**22.** The Baldwins assumed personal liability for up to $120,000 of June Partners' obligations to Softpro.

**23.** The taxpayers also argue that the tax court was inconsistent when it stated: (1) it could not find a creditor of the taxpayer who stands prepared to enforce the recourse debt obligation, and (2) the taxpayers were liable to Lease Pro on the recourse portion of the limited recourse note. The taxpayers fail to grasp the distinction between §§ 465(b)(2) and 465(b)(4), and the concept of economic reality.