WAG-A-BAG INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Wag-A-Bag, Inc. v. Commissioner
Docket No. 6480-90
United States Tax Court
T.C. Memo 1992-581; 1992 Tax Ct. Memo LEXIS 613; 64 T.C.M. (CCH) 948; September 29, 1992, Filed *613 Decision will be entered under Rule 155. For Petitioner: Ellis L. Reemer and Dennis M. Bresnan. For Respondent: Carmen M. Baerga. TANNENWALD
TANNENWALD
MEMORANDUM OPINION TANNENWALD, Judge: Respondent determined a deficiency in petitioner's Federal income tax for 1982 of $ 26,674.84 and additions to tax as follows: Additions To Tax
Sec. 6653(a)(1) [1]
Sec. 6653(a)(2)
Sec. 6661
$ 1,333.74
50 percent of
$ 6,668.71
the interest due
on the deficiency
Respondent also determined that petitioner was liable for increased interest under section 6621(c). The issue for decision is whether Wag-A-Bag Inc. was "protected against loss" within the meaning of section 465(b)(4) with respect to its pro rata share of partnership debt obligations. If this issue is resolved in favor of respondent, then the issues *614 involving the applicability of sections 6653(a), 6661, and 6621(c) will have to be decided. This case was submitted fully stipulated. The stipulation of facts and the accompanying exhibits are incorporated herein by reference. Petitioner is an Oklahoma corporation located in Andarko, Oklahoma, and engaged in the retail sale of food and gasoline. It timely filed its Federal income tax return for the calendar year 1982 on the accrual basis with the Internal Revenue Service Center, Austin, Texas. Petitioner is a C corporation which meets the ownership requirements of section 542(a)(2). The Partnership
During the taxable year ended December 31, 1982, petitioner possessed a 13.193334-percent interest in the Addison Associates Limited Partnership (partnership), the equivalent of two limited partnership units. Fifteen units of limited partnership interests were offered for sale in the partnership for a purchase price of $ 178,500 per unit. The limited partners, including petitioner, paid for their interests in the partnership by making a cash payment of $ 17,500 per unit acquired and issuing a negotiable promissory note (limited partner notes) for the balance. The limited *615 partner notes have been paid in full. The partnership was formed under the laws of the State of Connecticut to acquire and lease equipment. In connection with its leasing business, the partnership acquired three Boeing 737-130 aircraft (aircraft) on June 1, 1982. The partnership's purchase of the aircraft was the last in a series of acquisitions of such aircraft. Regional Airlines Leasing Corporation's Purchase of the Aircraft
On March 1, 1982, Regional Airlines Leasing Corporation (Regional), purchased three Boeing 737-130 aircraft from People Express Airlines, Inc. (People). Pursuant to a document entitled Participation Agreement, Regional agreed to purchase the aircraft for $ 12,300,000 and Bank of America National Trust and Savings Association (Bank of America) agreed to finance $ 9,532,500 of the acquisition price. Regional and Bank of America entered into (1) three separate notes entitled Non-Recourse Promissory Notes (Bank of America notes) dated March 1, 1982, one for each aircraft in the amount of $ 3,177,500, and (2) three separate documents entitled Mortgage and Security Agreements dated March 1, 1982. The Bank of America notes were variable rate notes bearing *616 interest at the rate of 110 percent of the sum of the prime rate publicly announced by Bank of America plus 1 percent. The notes were secured by a security interest in the aircraft and assignments of the leases (of the aircraft) to Bank of America. Payments on the notes were to be made in 28 equal installments on the first day of February, May, August, and November of each year commencing on August 1, 1982, and ending on May 1, 1989. The notes provided as follows: All payments of principal and interest to be made by the Borrower on this note shall be made only from the income or proceeds from the Collateral (as defined in section 5.1 of the Security Agreement) and the holder hereof, by its acceptance of this note, agrees that, except as provided above, it will look solely to the income and proceeds from the Collateral to the extent available for distribution as above provided and that the Borrower shall not be personally liable to the holder hereof for any amounts payable under this note, or, except as provided in the Security Agreement, for any liability under the Security Agreement. Pursuant to the participation agreement, Regional agreed to lease the aircraft to People. Three *617 separate lease agreements (user leases) dated March 1, 1982, were entered into between Regional, as lessor, and People, as lessee. People agreed to make 29 consecutive quarterly rental payments on the first day of February, May, August, and November of each year commencing on May 1, 1982, and ending on May 1, 1989. The first payment was to be equal to the cost of the aircraft multiplied by .00065988 for each day elapsed from the date of delivery to May 1, 1982. Each of the remaining 28 payments was to be in an amount equal to the cost of the aircraft multiplied by .0593892. The amounts of such payments were to be adjusted, negatively or positively, by the amounts that payments under the Bank of America notes differed from the amounts payable under the lease if interest were calculated at a rate of 18 percent annually. The user leases were assigned to Bank of America pursuant to the Mortgage and Security Agreements. All payments required under the Bank of America Notes and the user leases have been regularly made. The payments due under the user leases exceeded the payments due under the Bank of America notes by approximately $ 120,000 per quarter, or $ 480,000 annually. Payments *618 due under the leases were made directly to Bank of America. To the extent that payments due under the user leases exceeded the payments due under the Bank of America notes, the excess was paid to Regional. Arlington Leasing, Inc.'s Purchase of the Aircraft
The aircraft were subsequently purchased from Regional by Arlington Leasing, Inc. (Arlington). [2] Regional and Arlington entered into three separate documents dated May 1, 1982 (Arlington purchase agreements). Pursuant to these agreements, Arlington purchased each aircraft for $ 4,100,000 resulting in an aggregate price of $ 12,300,000. The purchaser was subject to the user leases and Bank of America's security interest in the aircraft. *619 Arlington paid the $ 12,300,000 purchase price as follows: (1) Cash payment of $ 500,000; and (2) three promissory notes. Pursuant to each note, Arlington was obligated to pay $ 3,933,333 over a period of 14 years with interest at 19.5 percent annually. Each note required 168 consecutive monthly payments of principal and interest, in arrears, of $ 68,482.11, due on the first day of each month commencing on June 1, 1982, and ending on May 1, 1996. The aggregate monthly payment due under the notes was $ 205,446. Regional and Arlington entered into three separate lease agreements dated May 1, 1982 (Regional-Arlington leases), one each for each aircraft purchased. The leases have a term of 12 years. Each lease required that Regional pay Arlington 24 consecutive quarterly payments of $ 165,000 on the first day of February, May, August, and November commencing on August 1, 1982, and ending on May 1, 1998, followed by four consecutive quarterly rental payments of $ 201,770 commencing on August 1, 1988, and ending on May 1, 1989, followed by 20 consecutive quarterly payments of $ 213,294 commencing August 1, 1989, and ending May 1, 1994. In the aggregate, the Regional-Arlington leases *620 called for 24 quarterly payments of $ 495,417, followed by 4 quarterly payments of $ 605,310, followed by 20 quarterly payments of $ 639,882. Each lease agreement contained the following provision: 11. Indemnity. Lessee agrees to assume liability for, and does hereby agree to indemnify, protect, save, defend (at Lessee's sole expense) and hold Lessor harmless from and against any and all liabilities, obligations, losses, damages, penalties, claims (including, without limitation, claims involving strict or absolute liability), actions, suits, costs, expenses and disbursements (including, without limitation, legal fees and expenses) of any kind and nature whatsoever ("Claims") which may be incurred, imposed on or asserted against Lessor, whether or not Lessor shall also be indemnified as to, or insured with respect to, any such Claim by any other person (a) in any way relating to or arising out of this Lease, any documents contemplated hereby to which Lessee is or may be a party, including, without limitation, any sublease to a Sublessee ("Lessee Documents"), claims of the holder of the Existing Liens, User or any other Sublessee, or the performance or enforcement of any of *621 the terms hereof or of the Lessee Documents, the agreements creating the Existing Liens or the User Leases; * * * As security for Regional's obligations under the Regional-Arlington leases, Arlington and Regional entered into three collateral assignments which granted Arlington all of Regional's rights under the user leases, subject to the rights of Bank of America, the user lease, and the rights of the user under the user lease. The payments required under the Regional-Arlington notes and the Regional-Arlington leases have been regularly made. Addison Associates Limited Partnership's Purchase of the Aircraft
The aircraft were next purchased by the partnership for $ 12,300,000 pursuant to a document entitled Purchase Agreement and Assignment dated June 1, 1982, entered into between the general partner, as trustee of the partnership, and Arlington. The partnership purchased the aircraft subject to the user leases and Bank of America's security interest in the aircraft. The purchase agreement and assignment contained the following provisions: 1.1 Conveyance of Equipment and Assignment. Subject to the terms and conditions hereof, Seller [Arlington] shall, and hereby *622 does, sell, assign, transfer, convey, and set over unto Buyer [Addison], and Buyer hereby purchases from Seller, the Equipment and all of Seller's right, title and interest in, to and under the User Documents, [3] subject and subordinate to the Existing Lien, the People Leases, the rights and interests of People under the People Leases and the rights and interests of User under the Leases. Seller hereby delivers to Buyer, and Buyer hereby acknowledges receipt of, a bill of sale and assignment (the "Bill of Sale") for the Equipment and all of Seller's right, title and interest in, to and under the User Documents. 4. Indemnification. Seller will indemnify Buyer and protect, defend and hold it harmless from and against any and all loss, cost, damage, injury or expense, including, without limitation, reasonable attorney's fees, wheresoever and howsoever arising which Buyer or its partners, or any of its, or their, directors, officers, agents, employees, stockholders or partners, may incur by reason of any material breach by Seller of any of the representations by, or obligations of, Seller set forth in the [User] Documents or by reason of the Bulk Sales Laws of any jurisdiction. *623 * * * The partnership paid the purchase price as follows: (1) Cash payment of $ 2,530,262; and (2) limited recourse promissory note (partnership note) in the amount of $ 9,769,738. The partnership note had a term of 12 years and bore interest at the rate of 19 percent annually. It required 48 quarterly payments on the first day of February, May,August, and November of each year commencing August 1, 1982, and ending May 1, 1994. The partnership note called for an initial quarterly payment of $ 314,531, followed by 23 quarterly payments of $ 494,517, followed by 24 quarterly payments of $ 604,409. The partnership note provided that it was a recourse obligation of the partnership in an amount (the recourse amount) equal to the lesser of (1) $ 8,500,000 or (2) the principal balance as of a given date plus interest accrued but unpaid to that date. Pursuant to the *624 Addison Associates Limited Partnership Amended and Restated Limited Partnership Agreement, [4] the limited partners of the partnership executed documents entitled Assumption Agreements whereby they agreed to assume personal liability for their pro rata share of the recourse amount of the partnership note. Section 1 of the assumption agreements, which enumerated the limited partner's liability with respect to the partnership note, provided in part: 1. From and after the date the Partnership delivers the Partnership Note to [Arlington] Leasing as payment of part of the purchase price for the Equipment, and subject to the provisions of, and conditions and limitations set forth in the Partnership Note, the Obligor hereby unconditionally assumes the payment to [Arlington] Leasing of an amount equal to the product of (i) that portion of the Recourse Amount demanded by [Arlington] Leasing and (ii) 6.59667% * * * times the number of [limited partnership] Units purchased by the Obligor pursuant to the Confidential Memorandum * * * *625 Payments required under the partnership promissory note have been regularly made. Arlington's rights as lessor under the Regional-Arlington leases, including the right to receive rental payments due under the leases, were assigned to the partnership. As of June 1, 1982, each aircraft had a fair market value of $ 4,100,000 and its residual value, i.e., fair market value at the end of the 12-year term of the Regional-People lease, was not less than 35 percent of that amount ($ 1,435,000). Petitioner, on its Form 1120 U.S. Corporation Income Tax Return for the taxable year ended December 31, 1982, reported $ 36,432 as its distributive share of the partnership's net income and $ 171,405 as its distributive share of the interest expense of the partnership for such year. The notice of deficiency disallowed deductions claimed by petitioner with respect to the partnership on the following grounds: (1) The partnership had not incurred the benefits and burdens of ownership in the aircraft purchased; (2) the purchase was not entered into for profit; and (3) petitioner was not at risk with respect to its pro rata assumption of partnership obligations. Respondent has conceded the first and *626 second grounds for such disallowance. Thus, the principal issue before us is whether petitioner was protected against loss within the meaning of section 465(b)(4) for its pro rata assumption of the recourse portion of the partnership note. [5]
Section 465 limits the deductibility of losses from certain activities, including the leasing of section 1245 property, [6] to the amount a taxpayer is considered at risk at the close of the taxable year. A taxpayer is generally considered to be at risk with respect to amounts borrowed to the extent such taxpayer is personally liable for the repayment of such amounts. Sec. 465(b)(2)(A). *627 There is no dispute between the parties that the terms of petitioner's assumption creates personal liability for petitioner's pro rata share of the recourse amount of the partnership note within the limits specified. To this extent, the requirements of section 465(b)(2)(A) have been satisfied. However, section 465(b)(4) provides that a taxpayer is not at risk "with respect to amounts protected against loss through nonrecourse financing, guarantees, stop loss agreements, or other similar arrangements". Numerous opinions by this Court and several Courts of Appeals have sought to particularize the scope of section 465(b)(4) with varying analyses. E.g., Emershaw v. Commissioner, 949 F.2d 841 (6th Cir. 1991), affg. T.C. Memo. 1990-246; Young v. Commissioner, 926 F.2d 1083 (11th Cir. 1991), affg. T.C. Memo. 1988-440; Moser v. Commissioner, 914 F.2d 1040 (8th Cir. 1990), affg. T.C. Memo. 1989-142; American Principals Leasing Corp. v. United States, 904 F.2d 477 (9th Cir. 1990); [7] *628 Thornock v. Commissioner, 94 T.C. 439 (1990). [8]
Respondent, relying on Young v. Commissioner, supra, Moser v. Commissioner, supra, American Principals Leasing Corp. v. United States, supra, and Thornock v. Commissioner, supra, contends that the nonrecourse nature of the underlying purchase loan, particularly when coupled with the high residual value of the aircraft, and the circular and virtually matching flow of note and lease payments, individually and in the aggregate, insulate petitioner from any personal *629 liability. Accordingly, respondent concludes that petitioner is protected against loss within the meaning of section 465(b)(4) for its pro rata share of partnership note. Petitioner, relying principally on Emershaw v. Commissioner, supra, counters that as the "obligor of last resort", it was fully at risk for its pro rata share of the recourse portion of the partnership note. The arguments of the parties have, to a large extent, been directed to the question of whether the proper standard governing the applicability of section 465(b)(4) is the "worst-case scenario" or "the realistic possibility of loss". We find it unnecessary to resolve such question because we have concluded that, whichever standard is used, the ultimate decision rests upon the substance of the transactions in light of all the facts and circumstances. See Thornock v. Commissioner, 94 T.C. at 449-450. Even the Court of Appeals for the Sixth Circuit in Emershaw v. Commissioner, supra, upon which petitioner relies so heavily, in disagreeing with the Ninth Circuit on the extent to which bankruptcy or insolvency *630 of a party to the transaction as distinguished from an outside guarantor or insurer should be taken into account, expressed its disagreement in terms of a different view of "economic reality". It is the facts and circumstances herein to which we now turn. We deal first with respondent's assertion that the nonrecourse character of Regional's obligation to the Bank of America is sufficient, in and of itself, to insulate all the obligors in the chain (Regional, Arlington, Addison, and the partners) from personal liability. Respondent asserts that realistically, if People defaulted on its rental payments, then Bank of America would foreclose on the aircraft and, because of their high residual value, would realize a sufficient amount on the foreclosure sale to satisfy the loan. As a consequence, respondent concludes that the recourse obligors would have only a meaningless paper obligation. We are not prepared to accede to respondent's blandishment to elevate this single factual element into an inexorable rule of law. No decided case has gone as far as respondent suggests. Indeed, those cases where nonrecourse indebtedness was present in the chain of liability have consistently listed *631 this element as only one of the influencing factors. Young v. Commissioner, supra; Moser v. Commissioner, supra; Thornock v. Commissioner, supra; Brifman v. Commissioner, T.C. Memo. 1992-375; Waters v. Commissioner, T.C. Memo. 1991-462, on appeal (2d Cir., Feb. 7, 1992).[9] It may well be that, in light of other factors such as totally independent transactions, substantially separate in time and involving significantly disparate amounts of money and dates of payment, the presence of initial nonrecourse financing may be accorded little, if any, effect. As far as the high residual value of the aircraft is concerned, we think this element has a mixed impact in view of the potential for fluctuations in market value. *632 We next consider respondent's contention that the circular nature of the arrangements, in and of themselves, are sufficient to protect petitioner against loss within the meaning of section 465(b)(4). Respondent asserts that the provisions of the various agreements created an essentially matching flow of lease and note payments which constitutes an "other similar arrangement" and brings the transactions within the ambit of Young v. Commissioner, supra, Moser v. Commissioner, supra, American Principals Leasing Corp. v. Commissioner, supra, and Thornock v. Commissioner, supra. As is the case in respect of respondent's contention concerning the effect of the nonrecourse purchase loan, see supra p. 15, we are not prepared to go as far as respondent suggests. None of the cases relied upon by respondent goes that far nor have any other cases done so. See, e.g., Krause v. Commissioner, 92 T.C. 1003, 1024 (1989). [10] Nevertheless, it is clear that such an element should be taken into account; even Emershaw v. Commissioner, supra, *633 upon which petitioner relies, does that. We reject petitioner's attempt to avoid the impact of the decided cases by pointing to the fact that, in those cases, the timing and amounts of lease and note payments were identical. The fact of the matter is that the variations in timing and amounts of such payments herein are not sufficiently great to convince us that they should be treated as anything more than "window dressing" for tax purposes. Moser v. Commissioner, 914 F.2d at 1049. 11 In connection with the foregoing, we think it of some significance that the purchase price of the aircraft in each of the sales involved herein was the same. [11]
*634 One other element herein needs to be taken into account. As our findings of fact show, see supra pages 7-9, the lease agreement between Regional and Arlington and the purchase agreement and assignment between Arlington and the partnership contained provisions for indemnification.[12] We think that these provisions constitute express collateral undertakings sufficient to satisfy even the seemingly narrower standard articulated in Emershaw v. Commissioner, 949 F.2d 841 (6th Cir. 1991), affg. T.C. Memo. 1990-246, so heavily relied upon by petitioner. We think the Court of Appeals for the Sixth Circuit was of the view that where there was an express collateral agreement on the part of a party to the transaction (as distinguished from a third-party guarantor or insurer), the possibility of the bankruptcy or insolvency of that party should not be taken into account in determining the applicability of section 465(b)(4). [13] Cf. Martuccio v. Commissioner, T.C. Memo. 1992-311. *635 The long and short of the matter is that the totality of the facts and circumstances herein lead to the conclusion that petitioner was not at risk with respect to its obligation for its pro rata share of the partnership note. At least petitioner, who bears the burden of proof, Rule 142(a), has not convinced us otherwise. The fact that this is a fully stipulated case does not relieve petitioner of that burden. Borchers v. Commissioner, 95 T.C. 82, 91 (1990), affd. 943 F.2d 22 (8th Cir. 1991). Additions to Tax and Increased Interest
The record indicates that, although petitioner was on notice as to possible tax problems in connection with its partnership interest, petitioner received favorable legal and accounting advice as to the tax consequences. We hold that petitioner has carried its burden of proof that it was not negligent and therefore should not be subject to the additions to tax under section 6653(a)(1) and (2). Brifman v. Commissioner, T.C. Memo. 1992-375; Martuccio v. Commissioner, T.C. Memo. 1992-311. With respect to the addition to tax under *636 section 6661, we are satisfied that there was sufficient authority supporting petitioner's position to satisfy the "substantial authority" condition to the application of that section. Waters v. Commissioner, T.C. Memo. 1991-462, on appeal (2d Cir., Feb. 7, 1992); Epstein v. Commissioner, T.C. Memo. 1991-252. As far as increased interest under section 6621(c) is concerned, our holding that petitioner was not "at risk" under section 465(a) mandates the conclusion that respondent's determination in respect of this item should be sustained. Section 6621(c)(3)(A)(ii) specifically provides that "any loss disallowed by reason of section 465(a)" is a "tax motivated transaction" so that any substantial underpayment, i.e., in excess of $ 1,000, will be subjected to increased interest. Larsen v. Commissioner, 89 T.C. 1229, 1279 (1987), affd. in part and revd. in part on other issues sub nom. Casebeer v. Commissioner, 909 F.2d 1360 (9th Cir. 1990); Peters v. Commissioner, 89 T.C. 423, 444 (1987); Brifman v. Commissioner, supra; *637 Martuccio v. Commissioner, supra.
Decision will be entered under Rule 155. APPENDIX
WAG-A-BAG COMPUTER EQUIPMENT LEASING TRANSACTION
(1) Regional purchases the aircraft from People for $ 12,300,000 as follows: (i) Cash payment of $ 2,767,500; and (ii) Loan Proceeds of $ 9,532,500. (See #2). (2) Regional borrows $ 9,532,500 on a nonrecourse basis to purchase the aircraft. Under the note, which has a 7 year term, Regional is to make 28 quarterly payment of approximately $ 610,000 commencing August 1, 1982. (3) People leases the aircraft from Regional for a 7 year term. Under the lease, People was required to make the following lease payments: (i) 1 at $ 8116; and (ii) 28 at $ 730,487. The lease payments commenced May 1, 1982. The leases were assigned to Bank of America and payments were made directly to Bank of America to satisfy Regional's obligation on the Bank of America note. Any excess was to be remitted to Regional. (4) Arlington purchases the aircraft from Regional for $ 12,300,000 as follows: (i) Cash payment of $ 500,000; and (ii) Recourse note for $ 11,800,000. Under *638 the recourse note, Arlington was required to make 168 monthly payments (14 year term) of $ 205,449 beginning June 1, 1982. (5) Arlington leases back the aircraft to Regional for a 12 year term, under which the following quarterly payments were required beginning August 1, 1982: (i) 24 at $ 495,417; (ii) 4 at $ 605,310; and (iii) 20 at $ 639,882. (6) Addison acquires the aircraft from Arlington for $ 12,300,000 payable as follows: (i) Cash payment of $ 2,530,262; and (ii) Limited recourse note for balance. Under the limited recourse note, which had a 12 year term, Addison was required to make the following payments: (i) 1 at $ 314,531; (ii) 23 at $ 494,517; and (iii) 24 at $ 604,409. The payments were to be made beginning August 1, 1982. Under the limited recourse note, the partnership was personally liable in an amount equal to the lesser of $ 8,500,000 or the current principal balance and accrued by unpaid interest. (7) Arlington assigns its rights (including its right to receive lease payments) under the Arlington-Regional lease to Addison. (8) The limited partners of Addison assume their pro rata shares of the partnership note *639 to Arlington. Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the taxable year at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. Regional, incorporated in 1982, and Arlington, incorporated in 1973, are wholly owned subsidiaries of Integrated Resources Inc., which have been engaged in the business of purchasing and leasing equipment, such as the aircraft. Respondent does not challenge the arm's-length nature of the transactions which occurred between Regional and Arlington in the instant case.↩
3. User Documents were defined in the purchase agreement and assignment to include all of the agreements heretofore described in these findings of fact.↩
4. Sec. 7(d) of the agreement provided as follows: (d) Assumption Agreement↩. The General partner, the Initial Limited Partner and each additional Limited Partner shall also deliver to the Partnership a Limited Partner Assumption Agreement in the form attached to the Memorandum covering the amount of the Partnership Note to be assumed by him.
5. The parties have stipulated that the limited partners are not at risk for purposes of sec. 465 for any amount of the partnership note in excess of the amount described therein as the recourse amount and that the limited partners are at risk for purposes of sec. 465↩ for their respective cash investments in the partnership and the limited partner notes.
6. The aircraft purchased by the partnership and leased to third parties constituted sec. 1245 property. See sec. 1245(a)(3).↩
7. This case is sometimes cited as Baldwin v. United States↩.
8. See also Brifman v. Commissioner, T.C. Memo. 1992-375; Martuccio v. Commissioner, T.C. Memo. 1992-311; Waters v. Commissioner, T.C. Memo. 1991-462↩, on appeal (2d Cir., Feb. 7, 1992).
9. Neither this Court nor the Court of Appeals for the Sixth Circuit considered the impact of the original nonrecourse loan in Emershaw v. Commissioner, 949 F.2d 841 (6th Cir. 1991), affg. T.C. Memo. 1990-246↩.
10. See also Brifman v. Commissioner, T.C. Memo. 1992-375; Martuccio v. Commissioner, T.C. Memo. 1992-311; Waters v. Commissioner, T.C. Memo. 1991-462↩, on appeal (2d Cir., Feb. 7, 1992).
11. See also Martuccio v. Commissioner, T.C. Memo. 1992-311↩.
12. The purchase agreement and assignment also provided that the partnership was entitled to all the "rights and interests" of Arlington under its lease agreement with Regional. See supra↩ pp. 8-9. 13. The indemnification provisions herein are almost identical with those in Waters v. Commissioner, T.C. Memo. 1991-462, on appeal (2d Cir., Feb. 7, 1992), and considerably broader in scope than those involved in Emershaw v. Commissioner, 949 F.2d 841, 849-850 (6th Cir. 1991), affg. T.C. Memo. 1990-246↩.