T.C. Memo. 2020-26

UNITED STATES TAX COURT

ROCK BORDELON AND TORIE BORDELON,[1] Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 19031-13, 27735-13,            Filed February 20, 2020.
          11905-14.


        P-H was in the healthcare business in the years at issue
(2008-11).  He owned H Corp. (which provided hospital management
services) and M LLC, which he formed to purchase and own a
hospital in Louisiana.  To make that purchase, in 2008 P-H borrowed
Loan 1 (a USDA development loan) from Bank 1 and listed M LLC
and H Corp. as the borrowers.  He executed a note on the borrowers'
behalf, listed the hospital and its equipment as collateral, and
executed a personal guarantee (required by the USDA) for Loan 1.

        For Federal tax purposes, M LLC was a disregarded entity, and
P-H reported its income and expenses on Schedule C, "Profit or Loss
From Business", of his return for each year at issue.  For 2008 and
2009, Ps reported net losses and claimed deductions attributable to

_____

        [1]Three cases are consolidated here:  Rock Bordelon and Torie Bordelon,
docket Nos. 19031-13 and 27735-13; and Rock Bordelon, docket No. 11905-14.

**[\*2]**  M LLC; and for 2010 and 2011, P-H reported net profits attributable to M LLC.

P-H also owned a 90% interest in K LLC, which owned and operated a hospital in Texas.  K LLC had substantial losses in 2008, about $14,000 of income allocable to P-H in 2009, and $0 of income in each of 2010 and 2011.  In 2011 K LLC obtained Loan 2 from Bank 2, which required P-H's personal guarantee.  P-H was the sole guarantor and the only member of K LLC bearing personal liability for Loan 2.  K LLC was treated as a partnership for Federal tax purposes and reported its income and expenses on Form 1065, "U.S. Return of Partnership Income".  For 2008 P-H claimed deductions for his share of K LLC's losses as reported on Schedule E, "Supplemental Income and Loss", of his return for 2008.

Loan 1 and Loan 2 were both substantially collateralized, and it was possible but not likely that P-H would have to make payments pursuant to his guarantees.

R issued notices of deficiency for the years at issue and determined that:  (1) for 2008 P-H failed to establish amounts "at risk" under I.R.C. sec. 465 to entitle him to deduct losses related to M LLC and (2) under I.R.C. sec. 704(d) P-H had an insufficient basis in K LLC to deduct related losses for 2008, and P-H failed to establish amounts at risk under I.R.C. sec. 465 to entitle him to deduct losses related to K LLC.  Ps concede the 2008 disallowance as to K LLC but contend that:  (1) P-H's personal guarantee of Loan 1 satisfies I.R.C. sec. 465 to allow him to deduct losses related to M LLC for 2008 and (2) P-H's personal guarantee of Loan 2 increased his basis in K LLC to allow him to deduct for 2011 the suspended losses disallowed for 2008.  At trial R added the contention that P-H was not sufficiently at risk to be able to deduct those losses.

Held:  P-H's personal guarantee of Loan 1 established sufficient amounts at risk under I.R.C. sec. 465 to entitle him to deduct the losses related to M LLC for 2008.

**[*3]**    Held, further, P-H's personal guarantee of Loan 2 increased his basis in K LLC under I.R.C. sec. 704(d) and established amounts at risk under I.R.C. sec. 465 sufficient to entitle him to deduct for 2011 his share of suspended losses disallowed for 2008.

Ray C. Mayo, Jr., for petitioners.

Edwin B. Cleverdon, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

GUSTAFSON, Judge:  The Internal Revenue Service ("IRS") determined deficiencies in income tax of petitioners, Rock Bordelon and Torie Bordelon, for 2008 and 2009 and accuracy-related penalties under section 6662(a)[2] for both years.  The IRS also determined deficiencies in income tax of petitioner Rock Bordelon for 2010 and 2011, accuracy-related penalties for both years, and an addition to tax under section 6651(a)(1) for 2010.  The determinations were as follows:

---

[2]Unless otherwise indicated, all section references are to the Internal Revenue Code (26 U.S.C.), as amended, in effect at all relevant times, and all Rule references are to the Tax Court Rules of Practice and Procedure.  Some dollar amounts are rounded in this opinion; and where they are, the precise amounts appear in the record and are not disputed.

[*4]

| Docket No. | Year | Deficiency | Addition to tax sec. 6651(a)(1) | Penalty sec. 6662(a) |
|---|---|---|---|---|
| 19031-13 | 2008 | $1,236,414 | --- | $247,282.80 |
| 27735-13 | 2009 | 1,631,644 | --- | 326.328.80 |
| 11905-14 | 2010 | 1,183,209 | $59,160.45 | 236,641.80 |
| 11905-14 | 2011 | 1,350,716 | --- | 270,143.20 |

Pursuant to section 6212(a), the IRS timely mailed statutory notices of deficiency for the determinations, and the Bordelons timely filed petitions under section 6213(a) for redetermination of the deficiencies, addition to tax, and penalties.

After concessions by the parties,[3] the remaining issues for decision are: (1) whether for 2008 (or a subsequent year) Mr. Bordelon was "at risk" for purposes of section 465 to the extent of almost $1 million of loss deductions he claimed related to Allegiance Hospital of Many, LLC ("Many LLC") (we hold that he was "at risk" for such amount in 2008); (2) whether Mr. Bordelon's basis in Allegiance Specialty Hospital of Kilgore, LLC ("Kilgore LLC"), increased in 2011 (we hold that it did); and (3) whether Mr. Bordelon was "at risk" for purposes of section 465 with respect to Kilgore LLC, thus entitling him to claim for that year a

_____

[3]The parties have stipulated that: (1) Mr. Bordelon is liable for the addition to tax under section 6651(a)(1) for taxable year 2010; (2) for taxable year 2008, the adjustment for bad debt deduction is $1,188,109; and (3) neither of the Bordelons is liable for the accuracy-related penalties for any of the years at issue.

**[*5]** corresponding deduction for partnership losses carried forward from 2008 (we hold that he was).

FINDINGS OF FACT

The Bordelons resided in Louisiana when they filed their petitions. For 2008 and 2009, the Bordelons properly filed their Forms 1040, "U.S. Individual Income Tax Return", as married filing jointly. For 2010 and 2011 Mr. Bordelon filed his own separate Forms 1040.

Allegiance Health Management, Inc.

During the years at issue Mr. Bordelon was in the healthcare business, from which he provided the couple's primary source of income. As part of his business, Mr. Bordelon owned a medical services company, Allegiance Health Management, Inc. ("AHM"), in Louisiana. AHM provided management services to hospitals, outpatient facilities, rehabilitation facilities, and medical clinics. For Federal tax purposes, AHM was a C corporation during 2008 and 2009 and an S corporation beginning in 2010. Mr. Bordelon directly owned 100% of AHM during the relevant years.

Allegiance Hospital of Many, LLC

In addition to AHM, Mr. Bordelon owned Many LLC, which he formed in 2008 to purchase and own a hospital in Many, Louisiana ("the Many Hospital").

**[\*6]** Many LLC was a single-member limited liability company ("LLC") that was subject to Louisiana law for State law purposes and was treated as a disregarded entity for Federal tax purposes during the relevant years. Mr. Bordelon directly owned 100% of Many LLC during the relevant years.

In July 2008 Mr. Bordelon used Many LLC and AHM to purchase the Many Hospital for $9.9 million. He funded the purchase using an agricultural development loan ("the Many Loan") obtained from Union Bank in Louisiana. Union Bank granted the Many Loan under a U.S. Department of Agriculture and Rural Development ("USDARD") lending program that provided banks with a Government guarantee on loans for certain development projects; however, as a condition for such loans, the USDARD required borrowers to execute personal guarantees for the full loan amount, $9.9 million in this instance.

The Many Loan was structured so that Many LLC and AHM were listed as the co-borrowers. On July 15, 2008, Mr. Bordelon executed a corresponding promissory note on behalf of Many LLC and AHM that reflected a payment schedule over 347 months, a maturity date of July 15, 2037, and collateral consisting of the Many Hospital facilities and equipment. Mr. Bordelon also executed the USDARD's required personal guarantee that made him directly liable

**[*7]** to Union Bank for the full amount of the Many Loan and any amounts due for as long as the Many Loan was outstanding.

The guarantee created strict obligations for Mr. Bordelon regardless of any obligations of the borrowers (Many LLC and AHM). Under the terms of the personal guarantee, Union Bank was not required to seek payment from any other source before demanding payment from Mr. Bordelon. The guarantee also clearly stated that the USDARD was "not a co-guarantor" on the Many Loan and that Mr. Bordelon had "no right of contribution" from the USDARD with respect to the guarantee. Furthermore, the guarantee provided that if the USDARD paid any amounts on the Many Loan to Union Bank, those amounts would become a Federal debt owed by Mr. Bordelon and subject to all remedies the USDARD could employ to recover the debt. There were no other guarantors to the Many Loan, and it remained outstanding through the years at issue.

Allegiance Specialty Hospital of Kilgore, LLC

During the relevant years, Mr. Bordelon also owned a 90.2% interest in Kilgore LLC, which owned and operated a hospital in Kilgore, Texas. The

[*8] remaining interests were owned by an LLC and an individual.[4] Kilgore LLC was treated as a partnership for Federal tax purposes.

Kilgore LLC was not profitable during the years at issue: It incurred substantial losses in 2008, earned less than $16,000 of income in 2009, and earned zero income in 2010 and 2011. On February 18, 2011, Kilgore LLC borrowed $550,000 ("the Kilgore Loan") from Home Federal Bank ("HFB") in Shreveport, Louisiana. The Kilgore Loan required 36 monthly payments, beginning in March 2011, and had a maturity date of February 18, 2014. On Kilgore LLC's behalf, Mr. Bordelon executed the loan and a corresponding promissory note with HFB. The note secured the debt with possessory collateral, including petitioners' residence in Louisiana, accounts receivable of Kilgore LLC, and a continuing security interest in amounts Kilgore LLC had or may have on deposit with HFB.

Mr. Bordelon also personally guaranteed the Kilgore Loan on February 18, 2011. Mr. Bordelon's guarantee of the Kilgore Loan was an absolute and unconditional guarantee of performance under the loan, entitling HFB to enforce its rights against Mr. Bordelon without proceeding against any other obligor on

[4]The parties have not alleged nor do we perceive any issues as to whether any of the adjustments in dispute here might be "partnership items" under section 6231(a)(3), which under section 6221 are "determined at the partnership level" and over which we might not have jurisdiction in this deficiency case.

**[\*9]** the underlying indebtedness. Mr. Bordelon's liability under the guarantee was unlimited and his obligations continuing. There were no other guarantors to the Kilgore Loan, and no other member of Kilgore LLC was personally liable for the debt. The debt remained outstanding at the end of 2011.[5]

Tax returns

For each year at issue, Mr. Bordelon reported the income and expenses of Many LLC on a Schedule C, "Profit or Loss From Business". For 2008 he reported a net loss--and claimed a corresponding deduction--of about $1.6 million related to Many LLC. For 2009 he reported a net loss--and claimed a corresponding deduction--of $176,000 related to Many LLC. For 2010 he reported a net profit of about $191,000 related to Many LLC. For 2011 he reported a net profit of $1.97 million related to Many LLC.

For each year at issue, Kilgore LLC reported its income and expenses on Form 1065, "U.S. Return of Partnership Income". For 2008 Mr. Bordelon reported losses of $2.7 million, of which roughly $2.2 million related to Kilgore

---

[5]The Commissioner argues that nothing in the record clearly shows the Kilgore Loan was still outstanding at the end of 2011, and a document that petitioners offered as evidence of a 2014 renewal of the 2011 guarantee had discrepancies that made the connection unclear. However, the maturity date on the promissory note is February 18, 2014, on a 36-month payment schedule. No indication of prepayment appears in the record, and we are satisfied that the Kilgore Loan and guarantee remained outstanding at the end of 2011.

[*10] LLC, on Schedule E, "Supplemental Income and Loss", and claimed corresponding deductions.  For 2009 he reported about $14,000 of income and zero income or loss for 2010 or 2011.

IRS examinations and SNODs

For each year at issue, the IRS reviewed the return, determined a deficiency, and timely mailed a statutory notice of deficiency ("SNOD") to petitioners.

The SNOD for 2008 disallowed, among other things, almost $1 million of Mr. Bordelon's $1.6 million claimed loss deductions related to Many LLC on the grounds that he had not demonstrated that he was "at risk" to the extent of the reported loss.  The IRS also disallowed the deductions claimed for the Schedule E losses related to Kilgore LLC for 2008 on the grounds that Mr. Bordelon did not have a sufficient adjusted basis in that entity to claim the deductions.  (The IRS did not determine, and does not contend here, that Many LLC and Kilgore LLC did not actually incur the expenses underlying those losses.  Rather, the only dispute is Mr. Bordelon's entitlement to deductions for those losses under the at-risk and basis-limitation rules.)

The Bordelons timely filed petitions in this Court.  The parties have settled various issues raised in the SNODs and the petitions, and the only issues remaining involve:  (1) Mr. Bordelon's amount at risk related to Many LLC for

**[*11]** 2008, (2) his basis in Kilgore LLC for 2011, and (3) his amount at risk related to Kilgore LLC for 2011.

OPINION

The Commissioner's determinations in a notice of deficiency are presumed correct, and the taxpayer bears the burden of proving them erroneous. Welch v. Helvering, 290 U.S. 111, 115 (1933); see also Rule 142(a). The taxpayer also bears the burden of proving his entitlement to any deduction claimed. New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440 (1934). If, in any court proceeding, the taxpayer puts forth credible evidence with respect to any factual issue relevant to ascertaining the liability of the taxpayer, the burden of proof shifts to the Commissioner. Sec. 7491(a)(1). When each party has satisfied its burden of production, then the party supported by the weight of the evidence will prevail, and thus a shift in the burden of proof has real significance only in the event of an evidentiary tie. See Knudsen v. Commissioner, 131 T.C. 185, 189 (2008), supplementing T.C. Memo. 2007-340.

We do not perceive an evidentiary tie in these cases and are able to decide the remaining issues on the preponderance of the evidence. The issues for decision are: (1) whether the personal guarantee that Mr. Bordelon executed in 2008 left him "at risk" under section 465 to the extent of $998,975 of loss

[*12] deductions related to Many LLC for 2008; (2) whether the personal guarantee that Mr. Bordelon executed in 2011 increased his basis in Kilgore LLC under section 704(d) to allow him to deduct $550,000 of suspended losses related to Kilgore LLC from 2008; and (3) whether he had sufficient amounts at risk under section 465 with respect to the Kilgore Loan to be entitled to deduct those losses.[6]

I.  Whether Mr. Bordelon was sufficiently at risk for the Many Loan in 2008

For 2008 Mr. Bordelon claimed loss deductions related to Many LLC.  The Commissioner has not challenged whether Many LLC incurred expenses in connection with a trade or business, but rather, whether in 2008 Mr. Bordelon was "at risk" for purposes of section 465 to the extent of $998,975 of such deductions. Consequently, Mr. Bordelon bears the burden to show that he was at risk for the Many Loan.

A.  Section 465 principles

1.  General rule

For certain taxpayers (including individuals and certain closely held corporations) who are engaged in certain activities (including each activity

---

[6]As for the burden of proof on the Commissioner's contention that Mr. Bordelon was not at risk with respect to the Kilgore Loan, see note 15 below.

[*13] engaged in by the taxpayer in carrying on a trade or business or for the production of income), section 465 generally limits loss deductions to the amount for which the taxpayer is considered "at risk".  Sec. 465(a), (c)(3)(A).  If losses are disallowed under section 465, then the losses are suspended and carried forward to the first succeeding taxable year (subject to the same "at risk" limitations) or to each year thereafter until the losses can be deducted.[7]  Sec. 465(a)(2).

### 2. Amounts at risk

A taxpayer's amount at risk for an activity generally includes:  "(A) the amount of money and the adjusted basis of other property contributed by the taxpayer to the activity, and (B) amounts borrowed with respect to such activity".  Sec. 465(b)(1).  Amounts borrowed are considered to be at risk only to the extent that the taxpayer:  "(A) is personally liable for the repayment of such amounts, or (B) has pledged property, other than property used in such activity, as security for such borrowed amount (to the extent of the net fair market value of the taxpayer's

---

[7]For the Many LLC loss deductions, Mr. Bordelon argued alternatively that if those deductions were disallowed for 2008, then a portion of them could be claimed for 2010 and 2011 corresponding with the Many LLC profits for those years (which increased Mr. Bordelon's basis in Many LLC).  The Commissioner did not dispute Mr. Bordelon's entitlement to this lesser alternative relief; but since we hold that Mr. Bordelon was sufficiently at risk to claim the disallowed losses for 2008, the Commissioner's implicit concession of the alternative argument has no effect on the outcome here.

[*14] interest in such property)." Sec. 465(b)(2) (emphasis added). Furthermore, "a taxpayer shall not be considered at risk with respect to amounts <u>protected against loss</u> through nonrecourse financing, guarantees, stop loss agreements, or other similar arrangements." Sec. 465(b)(4) (emphasis added).

### 3. Recapture

The at-risk rules include provisions for amounts previously deducted as losses to be recaptured as income in subsequent years when the amounts no longer remain at risk, i.e., when the amount at risk falls below zero. Sec. 465(e). For example, if a taxpayer is considered to be at risk to the extent of $1,000 in year 1 on account of debt for which he was liable, and if he therefore deducts $1,000 of losses for year 1, then the taxpayer's amount at risk would be reduced from $1,000 to zero at risk for year 2. If the loan were thereafter forgiven (or paid off by someone else), and if the taxpayer's original $1,000 worth of risk were therefore eliminated in year 2, then the taxpayer's amount at risk would fall to a negative amount: -$1,000. In that instance the taxpayer would be required to report the deficit as income for year 2, restoring equilibrium to the taxpayer's at-risk universe. (The recaptured amount is then added to any disallowed losses being carried forward, for eventual deduction when the activity produces income or when the at-risk amount increases.) In effect, these recapture rules help to protect

**[\*15]** against evasion of the at-risk rules by means of manufactured tax benefits that do not reflect economic reality.

  B. <u>Application to the Many Loan</u>

  With regard to the Many LLC deductions, the Commissioner contends that the personal guarantee that Mr. Bordelon executed in 2008 did not actually put him at risk to the extent of the disallowed deductions. The personal guarantee would qualify under section 465(b)(1)(B), if at all, only as an "amount[] borrowed". Thus, Mr. Bordelon must show: (1) that he was "personally liable" under section 465(b)(2)(A) for the Many Loan and (2) that he was not "protected against loss" under section 465(b)(4).

  1. <u>"Personally liable"</u>

  Section 465 does not specifically address whether a guarantor is considered "personally liable" (and therefore potentially "at risk") for amounts borrowed, but opinions in other cases construing section 465 have determined that some guarantees do result in personal liability. As a general matter, we have held that merely executing a guarantee is insufficient to establish personal liability for purposes of section 465(b)(2)(A). <u>See</u> <u>Brand v. Commissioner</u>, 81 T.C. 821, 828 (1983). The reason is that in the case of a typical guarantee, if the guarantor were required to pay on the underlying debt, the guarantor would generally be entitled

**[*16]** to seek reimbursement from the primary obligor; and in <u>Brand</u> we held that in such circumstances "Congress did not intend that a guarantor of a loan is personally liable for repayment of the loan within the meaning of section 465(b)(2)(A)." <u>Id.</u>

However, not all guarantees are created equal; and as we acknowledged in <u>Abramson v. Commissioner</u>, 86 T.C. 360, 376 (1986), when a guarantor is directly liable on a debt and there is no primary obligor bearing recourse liability for the debt, then the guarantor would not have any meaningful right to reimbursement and would thus be ultimately liable for the debt. Indeed, under those circumstances a guarantor's liability could clearly be distinguished from that in <u>Brand v. Commissioner</u>, 81 T.C. at 828, and would amount to personal liability for purposes of section 465(b)(2)(A). <u>Abramson v. Commissioner</u>, 86 T.C. at 376; <u>see also</u> <u>Thornock v. Commissioner</u>, 94 T.C. 439, 452-453 (1990).

Accordingly, a guarantor's personal liability for purposes of section 465(b)(2)(A) depends on whether or not the guarantor has the ultimate liability for the debt.[8] <u>See</u> <u>Melvin v. Commissioner</u>, 88 T.C. 63, 75 (1987), <u>aff'd</u>, 894 F.2d

---

[8]The "ultimate liability" analysis used to determine <u>personal liability</u> under section 465(b)(2)(A) is distinct from the "realistic possibility of economic loss" analysis used to determine <u>protection against loss</u> under section 465(b)(4) discussed below in part I.B.2 of this opinion.

[*17] 1072 (9th Cir. 1990).  To answer that question, we consider the "worst-case scenario" and then identify the "obligor of last resort" based on the substance of the transaction.  Id.  We ask:  If there are no funds to repay the debt and all of the assets of the activity or business are worthless, to whom would the creditor look for repayment?  See id.

In these cases we are persuaded that Mr. Bordelon bore the "ultimate liability" with respect to the Many Loan, satisfying the requirements of section 465(b)(2)(A).  In 2008 Mr. Bordelon obtained a $9.9 million loan through two of his wholly owned entities, Many LLC and AHM.  The loan was part of a USDARD lending program that required Mr. Bordelon to personally guarantee the full amount of the loan, and he executed the guarantee in 2008.  There were no other guarantors to the loan.  The guarantee created a direct liability against Mr. Bordelon that would have permitted Union Bank to pursue him directly without any action against Many LLC or AHM if either of them defaulted on the loan.  The only other viable option for Union Bank to pursue in the event of Many LLC's or AHM's default would have been to seek loss payments from the USDARD through its lending program, in which case Mr. Bordelon would have incurred a Federal debt obligation subject to the full recourse actions available to the U.S. Government for any such payments.  In either case, Mr. Bordelon most

[*18] certainly would have been ultimately liable for the debt, either to Union Bank or to the USDARD.

The Commissioner argues that "[u]nder Louisiana law, a member of an LLC is not personally liable for the debts of the LLC. La. Rev. Stat. §§ 12:1-622.B, 12:1303.A." We assume correct the Commissioner's analysis of Louisiana law in that a member of an LLC is not ordinarily liable for the debts of the LLC--nor is a shareholder personally liable for debts of his corporation. See Bridges v. AutoZone Props., Inc., 900 So. 2d 784, 797 (La. 2005). But Mr. Bordelon became liable for Many LLC's debt not because he was a member of the LLC but because he executed a personal guarantee for that debt. See La. Civ. Code Ann. art. 3045 (2019); see also 8 La. Civ. L. Treatise, Business Organizations sec. 33:3 (2019).

The Commissioner also argues that Mr. Bordelon was not personally liable for purposes of section 465(b)(2)(A) because "Louisiana law provides that 'A surety who pays the creditor is entitled to reimbursement from the principal obligor.' La. Civ. Code. § 3049 (1988)." That is, the Commissioner asserts that, if Mr. Bordelon made payments on the Many Loan, he then would have a right to reimbursement from the primary obligors--Many LLC and AHM. To evaluate this argument, however, we invoke the principle, stated above, that for purposes of section 465(b)(2)(A), we presume the worst-case scenario--a circumstance in

**[\*19]** which the primary obligors (Many LLC and AHM) would be worthless and thus unable to reimburse Mr. Bordelon for any amounts paid on account of his guarantee.

Moreover, even if we looked to Many LLC and AHM (whether or not deemed defunct or insolvent) as the obligors responsible <u>in form</u> for any such reimbursement, we cannot ignore the fact that Mr. Bordelon, as the sole owner of Many LLC and AHM, would still bear the economic responsibility for such reimbursement <u>in substance</u>. <u>See</u> <u>Melvin v. Commissioner</u>, 88 T.C. at 75 ("the fact that the partnership or other partners remain in the 'chain of liability' should not detract from the at-risk amount of the parties who do have the ultimate liability"). In other words, any reimbursement to which Mr. Bordelon might theoretically be entitled would be due to him from his own 100%-owned entity. Mr. Bordelon would ultimately be paying the debt, and the fact that he might then be entitled to seek reimbursement from himself would not render him any less at risk.

The Commissioner stresses that the Many Loan was substantially collateralized, that it was not likely that Mr. Bordelon would ever be called on to make payments pursuant to his guarantee, and that he did not in fact ever do so. But these facts do not undermine his personal liability under section 465(b)(2)(A).

**[\*20]** The Commissioner does not cite any authority for the relevance of these propositions, and the authorities that he does cite[9] in the "at risk" analysis rely on the "worst-case scenario"--a scenario in which the collateral is already deemed insufficient to cover the liability--and do not consider whether a payment from the guarantor was ever actually required or likely would be required.

Thus, as to the Many Loan we find Mr. Bordelon "personally liable" for purposes of section 465(b)(2)(A). We must next consider whether Mr. Bordelon was "protected against loss" for purposes of section 465(b)(4).

### 2. "Protected against loss"

Section 465(b)(4) states that "a taxpayer shall not be considered at risk with respect to amounts protected against loss through nonrecourse financing, guarantees, stop loss agreements, or other similar arrangements." This Court's analysis for loss protection under section 465(b)(4) has been similar to the analysis for personal liability under section 465(b)(2)(A). Under either paragraph, a

---

[9]See Melvin v. Commissioner, 88 T.C. 63, 75 (1987) ("The relevant question is who, if anyone, will ultimately be obligated to pay the partnership's recourse obligations if the partnership is unable to do so. It is not relevant that the partnership may be able to do so. The scenario that controls is the worst-case scenario, not the best case"), aff'd, 894 F.2d 1072 (9th Cir. 1990); Tepper v. Commissioner, T.C. Memo. 1991-402, 62 T.C.M. (CCH) 505, 510 (1991) ("Under the worst-case scenario, the assets of the partnership would be insufficient to satisfy the loan obligation and the general partner would be unable to repay the loan").

[*21] guarantor who had a right to reimbursement from a primary obligor is, as a general rule, not considered to be at risk. See Melvin v. Commissioner, 88 T.C. 63 (applying sec. 465(b)(4)); Brand v. Commissioner, 81 T.C. 821 (applying sec. 465(b)(2)(A)).

In Brand v. Commissioner, 81 T.C. at 828, we stated: "Since a guarantor is entitled to reimbursement from the primary obligor, it is clear that Congress did not intend that a guarantor of a loan is personally liable for repayment of the loan within the meaning of section 465(b)(2)(A)." That case involved guarantees by limited partners for amounts in excess of their initial capital contributions. Id. at 823-825. The primary obligor on the underlying debt was a limited partnership that had a general partner with personal liability for partnership debts. We determined that if a guarantor were required to pay an amount on the underlying debt beyond his initial contribution, then he would have a right to reimbursement from the general partner (i.e., a person with unlimited liability) and thus the guarantor's risk would be limited. See id. at 828.

In Melvin v. Commissioner, 88 T.C. at 71, we stated: "Where a taxpayer's debt obligation constitutes only a secondary liability under which the taxpayer has a right of reimbursement against the primary obligor, the taxpayer will not be treated as at risk with respect to such an obligation. The taxpayer's right of

[*22] reimbursement from the primary obligor is regarded as a type of protection against loss within the meaning of section 465(b)(4)." That case involved a limited partnership in which there was no general partner who carried unlimited personal liability for the debt at issue, because each limited partner executed a separate agreement guaranteeing a pro rata portion of the underlying debt if the partnership defaulted. Id. at 77. We determined that each guarantee was a definite and fixed recourse obligation to reimburse a pro rata portion of the underlying debt and thus any guarantor's risk was limited because of the definite and fixed right to reimbursement independent of the partnership's success or failure. Id.

In both Brand and Melvin, the guarantor's right to reimbursement limited the risk because the facts indicated a certainty as to the reimbursement, i.e., the right to reimbursement was meaningful. Conversely, when a guarantor's right to reimbursement is against a primary obligor that has only limited liability (e.g., a corporation or an LLC) and there is no definite or fixed recourse obligation for the underlying debt, then the right to reimbursement is less meaningful and thus there may indeed be risk.

Accordingly, when evaluating a guarantor's loss protections (including reimbursements from primary obligors), we look at the facts and circumstances to determine not only whether there is a right to the reimbursement but whether the

[*23] substance of the right is meaningful. In other words, we must consider the "realistic possibility" that the guarantor would ultimately be subject to "economic loss" if called upon to make payments on account of the guarantee. See Levien v. Commissioner, 103 T.C. 120, 126 (1994), aff'd without published opinion, 77 F.3d 497 (11th Cir. 1996); Miller v. Commissioner, T.C. Memo. 2006-125, 91 T.C.M. (CCH) 1267, 1276 (2006).

We note that in these cases, the realistic-possibility analysis of protection against loss under section 465(b)(4) is not contrary to or divergent from the worst-case-scenario analysis we apply for purposes of determining personal liability under section 465(b)(2)(A).[10] Indeed, the tests may intuitively run together in a

---

[10]Among the U.S. Courts of Appeals there has been a perceived split on the appropriate framework for analyzing section 465(b)(4)--i.e., whether analyzing "realistic possibility", see, e.g., Waters v. Commissioner, 978 F.2d 1310, 1316 (2d Cir. 1992), aff'g T.C. Memo. 1991-462; Young v. Commissioner, 926 F.2d 1083, 1089 (11th Cir. 1991), aff'g T.C. Memo. 1988-440 and T.C. Memo. 1988-525; Moser v. Commissioner, 914 F.2d 1040, 1048-1049 (8th Cir. 1990), aff'g T.C. Memo. 1989-142; Am. Principals Leasing Corp. v. United States, 904 F.2d 477, 483 (9th Cir. 1990), or else analyzing "obligor of last resort" under a "worst-case scenario", see, e.g., Emershaw v. Commissioner, 949 F.2d 841, 845 (6th Cir. 1991), aff'g T.C. Memo. 1990-246. These cases would presumably be appealable to the Court of Appeals for the Fifth Circuit (absent a stipulation to the contrary, see sec. 7482(b)(1)(A), (2)), and we know of no opinion of that court addressing this issue. However, the split may not really be implicated in a situation like the one in these cases. Although we acknowledge that in factually complex cases, such as those involving multi-party sale-leaseback transactions or stop-loss agreements, choosing between the tests might lead to different results, see, e.g.,

(continued...)

[*24] two-step at-risk analysis. For example, in facts involving an individual guaranteeing debts of his solely owned business, we would first apply the section 465(b)(2)(A) analysis presuming a worst-case scenario wherein the primary obligor defaults, becomes worthless, and is unable to make payments on the debt--thus triggering payments from the guarantor. See IRS Chief Counsel Advice 201308028 (Feb. 22, 2013).[11] Second, we would consider the realistic possibility of economic loss, in which case "it would be inappropriate * * * to then assume that the guaranteeing member will nevertheless be able to successfully seek subrogation, reimbursement, or indemnification from the primary obligor" who defaulted and became worthless in step 1. Id. Accordingly, we can apply both distinct analyses congruently in cases such as Mr. Bordelon's.

We determined above in part I.B.1 that Mr. Bordelon was personally liable for purposes of section 465(b)(2)(A). In that analysis we presumed that the

---

[10](...continued)
Thornock v. Commissioner, 94 T.C. 439, 450 (1990), we found little distinction between the two frameworks in Wag-A-Bag, Inc. v. Commissioner, T.C. Memo. 1992-581, 64 T.C.M. (CCH) 948, 952 (1992), and held that either would lead to the same result in that case. In these cases we follow Wag-A-Bag and find that in the circumstances before us, both approaches would lead to the same result.

[11]A memorandum of "Chief Counsel advice" is not precedent, sec. 6110(b)(1)(A), (k)(3), and we do not cite it as such. We use it simply as an illustration of one means of applying these two tests in tandem. We do not consider the Commissioner bound by this analysis or this method.

**[\*25]** primary obligors (Many LLC and AHM) were worthless and unable to pay the amount owed under the Many Loan. If we maintain that presumption as to the primary obligors and turn to the question of whether there is a realistic possibility of reimbursement, it is clear that Mr. Bordelon would not be protected against loss for purposes of section 465(b)(4) because his right to reimbursement would be against the worthless entities with no means to repay him for any amounts contributed.[12]

Mr. Bordelon executed a personal guarantee in 2008 for Many Loan. Under that guarantee, he became directly liable to Union Bank for the full amount of the debt if the obligors defaulted. There was no other guarantor on the debt, nor was there a definite or fixed right to any contribution from other members of Many LLC or from AHM on account of the debt. Indeed, Mr. Bordelon was the sole owner of these entities and the only person with unlimited liability for the Many Loan. Even if we disregard a worthlessness determination when considering Mr. Bordelon's realistic possibility of economic loss, we cannot disregard that in

---

[12]The Commissioner's position in this case suggests we ignore the presumption that AHM would be worthless and instead hold that Mr. Bordelon is not at risk because if he were required to make a payment as guarantor to the debt, then Louisiana law provided him with a right of reimbursement from AHM. However, ignoring the presumption that an obligor is worthless would be a divergence from our jurisprudence on the at-risk rules, and we are not persuaded that such divergence would be appropriate in these cases.

[*26] substance Mr. Bordelon was the only one involved with respect to the liability for the Many Loan, the corresponding promissory note, and the personal guarantee. Accordingly, we are persuaded that Mr. Bordelon was personally liable, not protected against loss, and ultimately at risk under the Many Loan during 2008 so as to be entitled to deduct the losses related to Many LLC that he claimed on the Bordelons' 2008 return.

II.     Whether Mr. Bordelon had a sufficient basis in Kilgore LLC for 2011

The Commissioner does not challenge any deductions or other partnership items reported by Kilgore LLC. Moreover, the Commissioner and Mr. Bordelon agree that for 2008, Mr. Bordelon's basis in Kilgore LLC was zero and that the IRS's disallowance of the $2.2 million claimed loss deduction was correct for 2008. However, Mr. Bordelon argues that his basis in Kilgore LLC increased for 2011 by $550,000 on account of his personal guarantee in 2011 of the Kilgore Loan and that his basis increase would allow him to deduct $550,000 of the losses disallowed for 2008 as carryforward losses for 2011. The Commissioner disagrees, arguing that Mr. Bordelon's basis did not increase in 2011 or, in the alternative, that Mr. Bordelon has not established that he was at risk at the end of 2011 for the Kilgore Loan.

**[*27]** A. <u>Partner's basis</u>

Section 704(d) generally limits a partner's loss deduction to an amount equal to his adjusted basis in the partnership at the end of the partnership year in which the loss occurred. Any excess that he could not deduct in that year would be carried forward until such time as the loss could be deducted. The <u>beginning basis</u> of a partner's interest in a partnership is the amount of money and the adjusted basis of the property contributed (increased by the amount of gain recognized by the contributing partner under section 721(b)). Sec. 722. The <u>adjusted basis</u> of a partner's interest in a partnership is determined under section 722 (relating to contributions to a partnership) or section 742 (relating to transfers of partnership interests) increased by his distributive share of partnership taxable income (plus any exempt income and excess depletion deductions). Sec. 705(a)(1). The adjusted basis of a partner's interest in a partnership is decreased (but not below zero) by distributions to the partner from the partnership and by the partner's distributive share of partnership losses (plus "expenditures of the partnership not deductible in computing its taxable income and not properly chargeable to capital account"). Sec. 705(a)(2). A partner's basis is increased by an increase in a partner's share of partnership liabilities and decreased by a decrease in the partner's share of partnership liabilities. Sec. 752(a).

[*28] A partner's share of partnership liabilities (and corresponding change to basis) is dependent upon whether the liability is <u>recourse</u> (i.e., the creditor has recourse to the partner) or <u>nonrecourse</u> (i.e., the creditor has no recourse to the partner). A liability is considered "recourse" to a partner only to the extent that the partner bears the economic risk of loss for the liability. 26 C.F.R. sec. 1.752-1(a)(1), Income Tax Regs. In the past, we held that "[t]he guarantee [by a partner] of an otherwise nonrecourse note places each guaranteeing partner in an economic position indistinguishable from that of a general partner with liability under a recourse note--except that the guaranteeing partner's liability is limited to the amount guaranteed." <u>Abramson v. Commissioner</u>, 86 T.C. at 374. Regulations promulgated after <u>Abramson</u> provide, to similar effect, a "constructive liquidation" test for determining whether a liability is recourse to a partner. <u>See</u> 26 C.F.R. sec. 1.752-2(b)-(k), Income Tax Regs. Under that test, the following events are deemed to occur simultaneously: all partnership liabilities become payable in full; all assets (except property contributed to secure a partnership liability) become worthless; the partnership disposes of all of its property in a fully taxable transaction for no consideration (other than satisfaction of nonrecourse liabilities secured by the property); the partnership allocates all items of income, gain, loss, or deduction for its last taxable year as of the date of the constructive liquidation;

**[\*29]** and the partnership liquidates. <u>Id.</u> para. (b)(1). If a partner would be liable for a debt under those circumstances, then the liability is deemed recourse to that extent. <u>Id.</u> para. (b).

### B. Kilgore LLC

During the relevant years, Mr. Bordelon was the majority member--a 90% member--of Kilgore LLC. Kilgore LLC reported losses for 2008, and Mr. Bordelon claimed a deduction for 90% of those losses on his 2008 return. The Commissioner disallowed the deduction for lack of basis in the partnership, and Mr. Bordelon agreed to the adjustment for 2008, acknowledging that he had a zero basis in Kilgore LLC. The losses became suspended until such time as Mr. Bordelon acquired a basis in Kilgore LLC.

In 2011 Kilgore LLC borrowed $550,000 from HFB. The loan had a three-year term and a 36-month payment schedule. Mr. Bordelon personally guaranteed the loan. There were no other guarantors on the loan, and no other member of Kilgore LLC had personal liability for any amount of the loan. Nothing in the record indicates that the terms of the loan, including its 36-month payment schedule and three-year term, were not honored; nothing in the record indicates that Mr. Bordelon withdrew his guarantee or was released from his

[*30] guarantee; and nothing in the record indicates the loan was paid in full before its maturity date in 2014.[13]

Applying the "constructive liquidation" test to these facts, we do not perceive any scenario in which Mr. Bordelon could not be considered economically at risk for the HFB debt to the full extent of his guarantee. There were no other partnership assets securing any of the debt; no other partner was liable for any portion of the debt; and if the debt were due in full, HFB would certainly have sought payment directly from Mr. Bordelon. Thus, we are persuaded that when Mr. Bordelon guaranteed the loan in 2011, it became a recourse obligation to Mr. Bordelon and increased his basis in Kilgore LLC by

---

[13]The Commissioner argued that Mr. Bordelon failed to show that the loan was outstanding in 2011. We are persuaded that the loan remained outstanding at the end of 2011. The only means by which the loan could not have remained outstanding in 2011 would be payment in full before the end of 2011--which we do not find occurred in these cases. Moreover, if we presumed full repayment did in fact occur, then we would further presume repayment would have resulted in a partnership item reported by Kilgore LLC as a distribution to Mr. Bordelon for relief of his recourse liability--a liability which the parties stipulated. See sec. 752(b); see also 26 C.F.R. sec. 301.6231(a)(3)-1(a)(4), Proced. & Admin. Regs. However, neither party provided partnership returns indicating such a discrepancy or issue concerning partnership items relevant to these cases, and the Commissioner failed to raise or present any issue as to any such item or a pending partnership audit (which under TEFRA would preclude us from deciding the instant cases until the TEFRA partnership case was resolved), and thus we hold the matter to be conceded.

[*31] $550,000,[14] which then allowed him to deduct the same amount in Kilgore

LLC losses carried forward from 2008.

III.     Whether Mr. Bordelon was at risk with respect to the Kilgore Loan[15]

As for Mr. Bordelon's amount at risk, the foregoing basis analysis enables

us to reach easily the conclusion that his guarantee of the Kilgore Loan increased

his amount at risk in Kilgore LLC for 2011.  We assume that there might be a

scenario in which a partner's basis could increase on account of a guarantee but in

which the guarantee would not result in his being considered at risk under section

465, but this is not such a case.

With respect to section 465(b)(2)(A), the personal guarantee in 2011 made

Mr. Bordelon personally liable for the loan.  He was directly liable to HFB for the

---

[14]The Commissioner has made no argument (other than disputing that the debt was recourse) against the contention that, when Mr. Bordelon guaranteed the Kilgore Loan in 2011, his basis increased by the full $550,000.

[15]The determination that Mr. Bordelon was not at risk with respect to the Kilgore Loan does not appear in the SNOD but rather was raised by the Commissioner at trial.  We therefore presume it is "new matter" as to which the Commissioner bears the burden of proof.  See Rule 142(a)(1).  However, the allocation of the burden of proof on this issue does not affect the outcome, because we decided the facts about the Kilgore Loan in connection with the basis issue (in part II.B above) where petitioners bear the burden of proof, and even then the facts favored petitioners.

[*32] underlying debt if a default occurred, and there was no right for a contribution or reimbursement from any other member of Kilgore LLC.

With respect to section 465(b)(4), there was no loss protection for Mr. Bordelon on the amount guaranteed. There were no other guarantors, and no other member of Kilgore LLC was personally liable for any portion of the debt. Therefore, we find that Mr. Bordelon was at risk in 2011 for the Kilgore Loan.

The Bordelons are entitled to the disallowed 2008 Many LLC loss deductions and the 2011 Kilgore LLC loss deductions.

To reflect the foregoing,

<u>Decisions will be entered</u>

<u>under Rule 155</u>.